[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 149 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 150 
The bill, filed in this cause, alleges that Russell S. Brown, being indebted to Truscott and Green in a large sum of money, in order to secure a part thereof, on the 15th day of September, 1837, executed his bond to them in the penalty of $100,000, conditioned for the payment of $50,000 with interest as therein mentioned; and that to secure the payment thereof, on the same day, Brown, and Rodman Starkweather and Martha his wife, executed to Truscott and Green, their mortgage upon certain premises situate in the county of Erie, particularly described, which was duly acknowledged, and afterwards, on the 16th day of October, 1837, recorded in the office of the clerk of that county. That on the 5th day of March, 1838, Truscott and Green, to secure Janet Stritch, of Exeter, in England, about $22,000, in which sum they were indebted to her, assigned said bond and mortgage to her as collateral security. That default in payment of the interest having been made, the complainants, on the 31st day of January, 1839, brought their bill in the court of chancery before the vice chancellor of the eighth circuit for the foreclosure of the mortgage and sale of the mortgaged premises, and made the mortgagors, with Moses Baker, Augustus Rayner, and Alonso Rayner, the only parties defendants. That the bill was taken as confessed as against the three last named defendants, and was put at issue by an answer of the other three, and a replication filed thereto. After which, and in March, 1843, said Brown died, leaving a will by which he devised all his interest in the premises mortgaged to Starkweather, who was appointed sole executor. That after the death of Brown, his will was duly proved and recorded and letters testamentary issued to Starkweather, and the suit duly revived against the surviving defendants. That such proceedings were subsequently had in the suit, that afterwards, at a court of chancery held on the 9th day of December, 1845, a final decree was entered, for the foreclosure and sale *Page 152 
of the mortgaged premises in the usual form; and that at the time of filing the bill in this cause, there was due to the complainants upon said mortgage and decree, including interest to December 1st, 1845, $79,176,37, besides the costs in said suit.
That the complainants had been informed, that prior to the execution of said bond and mortgage, and on the 22d day of April, 1835, Brown Starkweather executed their bond to Richard S. Williams in the sum of $40,000, conditioned to pay $20,000; and also, at the same time, executed to Williams a warrant of attorney authorizing a judgment to be entered thereon; and that afterwards, on the 14th day of October, 1835, Williams caused a judgment to be entered thereon in the supreme court, for $40,000 of debt, and $18,79, damages and costs, which was duly docketed on that day.
That the complainants were informed and believed that at the time of the execution of the bond and warrant, or at the time of entering the judgment, no part of the sum of $20,000 was due and owing from Brown Starkweather to Williams; or if any thing, but a small part of said sum; and the complainants charged, upon information and belief, that the bond and warrant were executed, and the judgment entered, for the purpose of securing such advances as Williams should thereafter make on the drafts of Brown Starkweather; and that, at the time of recording their mortgage, on the 16th day of October, 1837, there was not any thing due from Brown Starkweather to Williams for such advances; or, if any thing was then due, that the same was subsequently paid by them, or one of them; and that there was not then, nor at the time of the sale of the mortgaged premises under the said judgment, any thing due, which had become due, or was secured by the judgment, prior to the recording of said mortgage.
The bill further alleged, on information, that prior to the 16th day of October, 1837, Brown Starkweather, or one of them, had assigned and delivered to Williams, as collateral security for the payment of the moneys secured by the judgment, certain *Page 153 
choses in action, which Williams subsequently surrendered and redelivered to Brown Starkweather, or to one of them; that after the death of Brown, in May, 1844, Williams commenced proceedings by scire facias to revive the said judgment as against Starkweather and the devisees of Brown, and that he obtained judgment thereon in January, 1845, with $63,69 costs.
That after the commencement of said proceedings to revive the judgment, but at what time the complainants were not informed, Williams assigned the judgment to the defendant, King, who subsequently caused a fieri facias to be issued thereon, tested the 18th day of May, 1845, directed to the sheriff of Erie; that the sheriff levied on the mortgaged premises, and afterwards, on the 4th day of August, 1845, sold the same to the defendant King, and executed to him a certificate of such sale. That King claims that the judgment, at the time of sale, was a lien on the mortgaged premises, prior to and superior to the lien created by said mortgage; and that by his purchase he had acquired a lien prior to the mortgage; and that his interest in the premises was not subject to the mortgage, and that the complainants had no interest in the premises, except as subject and subsequent to the judgment.
It is then alleged, that at the time of the execution of the mortgage, and of the recording thereof, there was nothing due to Williams for advances or liabilities incurred by him for Brown 
Starkweather; or if there was any thing due and secured by the judgment, it was afterwards fully paid by them, or one of them; and that at the time of issuing the execution, and of the sale under it, the judgment was not a lien on the premises prior to the mortgage. And the complainants insist, that if there was any thing due on the judgment at the time of issuing the execution, it was for advances and liabilities incurred by Williams, after the recording of the mortgage, and after notice thereof to Williams. The bill prayed for an answer, and that the mortgaged premises might be declared and decreed to be free and clear of and from the judgment; and that the sale by the sheriff might be declared void; and that King be perpetually *Page 154 
enjoined from taking a deed of the premises under his purchase, and for general relief.
The defendant answered, that he was ignorant, and not informed, whether Brown was indebted to Truscott Green, or whether he executed his bond to them, or whether Brown Starkweather and wife executed a mortgage to them, or whether Truscott Green made any transfer thereof to Stritch, or whether the complainants commenced proceedings to foreclose such mortgage, as stated in the bill. He admits the death of Brown, and that he left a will; but was ignorant of its provisions.
The answer admits that Brown Starkweather executed to Williams a bond, as stated in the bill, and that such judgment was entered thereon; and alleges that at the time of giving the bond to Williams, there was justly due to him, from Brown 
Starkweather, more than $20,000; and that at the time of recording the mortgage, there was justly due and secured by the judgment to Williams, $20,000 and upwards; and from that day to the time of the answer, there was, and had been at all times, due and owing to Williams, upon the judgment, more than $20,000.
The answer denies, that before or at the time of recording the mortgage, Brown Starkweather, or either of them, had assigned, or put into the hands of Williams, as collateral security for the payment of the moneys secured by the judgment, any choses in action or other securities, or that he delivered back to them, or either of them, any such securities, or that Williams ever had any notice of the mortgage. It admits the recovery of the judgment, and the assignment of it to the defendant, the issuing of the execution and sale of the premises, and purchase thereof under the judgment as alleged in the bill. It alleges that the defendant, at the time he purchased the judgment, was informed and believed that there was due to Williams thereon more than $25,000, and that it was a lien upon said premises; and the defendant insists that by such sale and purchase he became equitably and legally entitled to all the interest which Brown 
Starkweather had in the same, at the docketing of *Page 155 
the judgment, subject only to the right of redemption given by statute.
The complainants filed a replication, and called Williams as a witness, who testified in substance, that the judgment was confessed by Brown Starkweather to him, to secure the firm of Richard S. Williams Co., of which he was a member, as well their then indebtedness, as such as should thereafter exist, for advances which the firm had made, and should thereafter make, upon acceptances of their drafts. After the judgment was confessed, in April, 1835, the firm was in the habit of accepting their drafts, and they were in the habit of providing the firm with funds and means of payment. The firm charged them with acceptances in their books, and credited them with the funds provided when received. The witness could not recollect, on his direct examination, whether Williams Co. had paid any such drafts, without being provided the means, by Brown 
Starkweather; but he had no doubt that Williams Co. received from them, between April and October, as much money as the drafts which they had previously accepted amounted to. That between October, 1835, and the 16th day of October, 1837, they, Williams Co., had continued from time to time to accept drafts and pay them for Brown Starkweather, but whether they paid any, for which they had not been provided with funds, the witness could not say, though he thought that they had. That since the 17th day of November, 1837, Williams Co. had received from Brown 
Starkweather, or on their account, a larger sum of money than was due to them at that date.
After examining his memoranda, on a cross-examination, this witness further testified, that on the 16th day of October, 1837, there was a balance due from Brown Starkweather to Williams 
Co. of the sum of $20,608; and that as he recollected the state of the accounts between Williams Co. and Brown Starkweather, from the date of the judgment, there was always a greater liability than $20,000. Williams Co. had a settlement with Starkweather Brown, on the 20th February, 1839, when there was found a balance due to Williams Co. of *Page 156 
$22,742,26; and at the time the judgment was assigned to the defendant King, the balance was more than $30,000. That Brown 
Starkweather were never indebted to the witness Williams, as an individual, at all.
On a re-examination by counsel for complainants, the witness further testified, that about $11,400 of the $22,742,26, accrued to Williams Co. for moneys advanced to redeem their acceptances of Brown Starkweather's drafts. That the balance was for moneys paid by them, before the 20th of February, 1839, as indorsers for Brown Starkweather, of two bills of exchange drawn by Green, Brown Co., in their favor, and which they indorsed about the 7th of March, 1837, under an express understanding that they were under, or covered by the securities which Williams and Co. held. In answer to the question put to the witness, whether there were any other securities put in their hands besides the judgment in question, collateral with it, to cover their liabilities for Brown Starkweather, he answered that there were; that the first was a mortgage on lands at the west, and the other a mortgage drawn by Brown Starkweather, on property in Buffalo. The mortgages were for $10,000 each. The latter mortgage was assigned to the defendant King, (a decree had been previously obtained upon it, and the decree was assigned to the defendant,) as collateral for the debt, with the judgment; and as to the disposition made of the other mortgage the witness did not remember. In addition to these mortgages, Brown delivered to Williams a number of notes, which he said were part of the assets of Green, Brown Co., and had been paid to him in some arrangement between those parties. That Williams Co. received upon these notes not far from $10,000. The witness thought that the amount received on the notes was credited in the account of the two bills of exchange which the firm indorsed, and on which they originally paid, over $20,000, and the balance, after crediting the amount received on the notes, was about $11,000. That after the 16th of October, 1837, the balance of accounts due Williams Co. from Brown Starkweather, was never less than $20,000. *Page 157 
The execution of the bond and mortgage, recording, and assignment thereof, the prosecution and decree for foreclosure and sale obtained thereon, the death and will of Brown, the appointment of Starkweather as executor, as set up in the bill, were admitted on the hearing.
I cannot doubt that the judgment in its inception was a valid security upon the mortgaged premises, to the extent of $20,000, with the costs of entering it, whether a debt in whole, or only in part, then existed, to that amount or not, if it was agreed at the time, between the parties, that it should be given as an indemnity, against advances or responsibilities to be thereafter made or incurred by Williams Co. for Brown Starkweather, to that amount, and such advances were afterwards made, or responsibilities incurred.
The principle is well established, that a mortgage or judgment may be taken and held as a security for future advances and responsibilities, to the extent of it, when that forms a part of the original agreement, between the parties; and the future advances will be covered by the mortgage or judgment in preference to the claim under a junior intervening incumbrance, with notice of the agreement.
The principle is, that subsequent advances cannot be tacked to a prior security, to the prejudice of a bona fide junior incumbrancer; but a mortgage or judgment are always good to secure future loans when there is no intervening equity.
Thus in Gordon v. Graham, (7 Vin. Abr. 52, E. pl. 3,)cited in Powell on Mortgages, ed. 1807, 544, where A. mortgaged his estate to B. for a term of years, to secure a sum of money already lent to A., and also all other sums as shouldthereafter be lent or advanced to him, A. made a second mortgage to C., for a certain sum, with notice of the firstmortgage, and then the first mortgagee having notice of thesecond mortgage, lent a further sum. Lord Cowper decreed that the second mortgagee should not redeem the first mortgage, without paying as well the money lent after, as that lent before the second mortgage was made; for, he added, it was the folly of the second *Page 158 
mortgagee, with notice to take such security. In Livingston Tracy v. McInlay, (16 John. 165,) a judgment had been entered up on a bond for $4,000, conditioned to pay $2,000, the defendant being at the time indebted to the plaintiffs in only the sum of $1,118 for money lent, but it was agreed at the time that further advances should be made to the defendant by the plaintiffs, and the plaintiffs gave the defendant a memorandum in writing that no execution should issue for more than was actually due. The plaintiffs afterwards lent the defendant the further sum of $350, and thereafter issued an execution upon the judgment with directions to levy $1,653,91. A subsequent judgment creditor of the defendant issued his execution for $289,53, and the sheriff having levied on the first execution $1,322 49, and having paid over to the plaintiffs therein $966,17, held the residue to be paid to either of the parties who should be held entitled to receive it. A motion was then made in behalf of the plaintiffs in the second execution, that the sum of $350 should be deducted from the amount directed to be collected on the first mentioned execution. It was contended, that a judgment of the court could never be used by the plaintiff to collect any debt or demand arising subsequently, and which was not included in the judgment at the time it was rendered. But the court observed that it was part of the original agreement at the time judgment was entered, that it should be a security for future advances, beyond the amount then actually due to the plaintiffs; and held that there was no objection to that, any more than to a mortgage being held as security for future advances; so far, at least, as the amount of the condition of the bond. That if the amount of the advances, or responsibilities, exceeded the condition of the bond, it would present a different question.
In Brinkerhoff v. Marvin, (5 John. Ch. 320,) the chancellor held, that a judgment or other security might be taken and held for future responsibilities to the extent of it. And so in James v. Johnson, (6 John. 417,) the chancellor said, that in many cases, a subject pledged for a debt, might be considered as a security *Page 159 
for further loans; and that he saw no possible objection to it, if no intervening right exists to prevent the justness of the application of the rule.
In the case of the United States v. Hooe, and others, (3Cranch, 73,) Marshall, Ch. J. says: "That the property stood "bound for future advances, is, in itself, unexceptionable. It "may, indeed, be converted to improper purposes; but it is not "positively inadmissible. It is frequent for a person, who expects to become more considerably indebted, to mortgage property to his creditors as a security for debts to be contracted, "as well as for that which is already due."
In that case the facts, so far as respects this question, were shortly these: Fitzgerald, being appointed collector, Hooe executed a bond with him as his surety to the United States, and being desirous to procure Hooe to indorse his notes at a future day to enable him to raise money upon them at a bank, conveyed a part of his real estate to trustees in trust, to indemnify Hooe on account of his having become his surety to the United States, and on account of notes to be indorsed by him for the accommodation of Fitzgerald at such bank. And so it was held, inShirras and others v. Caig and Mitchell, (7 Cranch, 34,) that a mortgage should stand to secure the real equitable claims of the mortgagees, whether they existed at the date of the mortgage, or arose afterwards, and before notice of the defendant's equity. The bill in that case was brought to foreclose a mortgage of a lot, houses and wharf in Savannah, called Garidner's wharf, which were in the possession of the defendants. The mortgage bore date the first day of December, 1801, and the mortgagor had title to an undivided half part of the premises. Subsequently each of the defendants became vested of an undivided third part of the premises. The defendants resisted the claim to foreclose, on various grounds. The mortgage purported on its face to secure a debt of thirty thousand pounds sterling, due to all of the mortgagees, but it was really intended to secure different sums, due at the time toparticular mortgagees, and advances afterwards to be made, and liabilities to be incurred to *Page 160 
an uncertain amount. Marshall, Ch. J. said, it was true that the real transaction did not appear on the face of the mortgage. And that it was not to be denied, that a deed, which misrepresents the transaction it recites, and the consideration on which it is executed, is liable to suspicion. That it must sustain a rigorous examination. That it was always advisable, fairly and plainly to state the truth. But if, upon investigation, the real transaction should appear to be fair, though somewhat variant from that which is described, it would seem to be unjust and unprecedented to deprive the person claiming under the deed of his real equitable rights, unless it be in favor of a person who has been, in fact, injured and deceived by the misrepresentation. And it was held that the complainants had a just title under their mortgage, to subject one moiety of the premises described in the mortgage of which the mortgagor at the time of executing it was seised, to the payment of the debts remaining due to them, which were either due at the date of the mortgage, or were afterwards contracted on the faith of it, either by advances actually made, or liabilities incurred, prior to the receipt of actual notice of thesubsequent title of the defendants.
Judge Story in Conrad v. The Atlantic Ins. Co., (1Peters, 386, at p. 447,) observed, that mortgages might as well be given to secure future advances and contingent debts, as those which already exist, and are certain and due. And again inLeeds v. Cameron, (3 Sumner, 488,) the same learned judge remarked that nothing could be more clear, both upon principle and authority, than that, at the common law, a mortgage bonafide made, may be for future advances, and liabilities for the mortgagor by the mortgagee, as well as for present debts and liabilities. And to the same effect, are the following cases:Hubbard v. Savage, 8 Conn. Rep. 215; Walker v.Snediker, 1 Hoffman Ch. Rep. 145; Commercial Bank v.Cunningham, 24 Pick. 270; Monell v. Smith Jenkins, 5Cow. Rep. 441; Lyle v. Ducomb, 5 Binney, 585; 4 Kent'sCom. 175; Lansing v. Woodworth, 1 Sandf. Ch. Rep. 43;Barry v. Merchants' Ex. Co., 1 Sandf. Ch. Rep. 314. *Page 161 
But in order to secure good faith, and prevent error and imposition in dealing, it is necessary that the agreement as contained in the record of the lien, whether by mortgage or judgment, should give all the requisite information as to theextent and certainty of the contract, so that a junior creditor may, by inspection of the record, and by common prudence and ordinary diligence, ascertain the extent of the incumbrance. (St. Andrew's Church v. Tompkins, 7 John. Ch. 14; Pettibone v. Griswold, 4 Conn. Rep. 158; Stoughton v.Pasco, 5 Conn. Rep. 442; Shepard v. Shepard, 6 Conn.Rep. 37; Hubbard v. Savage, supra; Gaber v. Henry, 6Watts, 57; Walker v. Snediker, supra; Hart v. Chalker, 14Conn. Rep. 77.) In the case of the Bank of Utica v. Finch,
(3 Barb. Ch. Rep. 293,) it was held that where a bond and mortgage were given to secure a particular debt mentioned therein, the mortgagee could not, as against subsequent purchasers or incumbrancers, hold it as a lien for an entirely distinct and different debt, upon parol proof that it was intended to cover that debt also. But that a mortgage or a judgment might be given to secure future advances and responsibilities, or as a general security for balances which might be due, from time to time, from the mortgagor or judgment debtor. That such security might be taken in either form, for a specific sum of money, large enough to cover the amount of the floating debt intended to be secured thereby, and such future advances and responsibilities will be protected by such security, to the extent of the sum mentioned therein, in preference to any claim under a junior incumbrance with notice, although such security on its face does not specify that future advances or responsibilities to be made or incurred are provided for in such sum. Parol evidence is admissible to show the purpose and intent for which such security was executed, and it does not conflict with the principle that such evidence cannot be admitted to contradict the written instrument. But neither a mortgage or judgment can be rendered available to secure the party taking them, for future advances or responsibilities, by any subsequent parol agreement, *Page 162 
in preference to the lien of a junior incumbrancer. (Walker v.Snediker, supra; Ex parte Hooper, 19 Vesey 447; 4 Kent'sCom. 176.)
The record in this case, shows that the judgment was confessed and entered up to secure Williams a specific sum of money, to wit: $20,000; and from the face of it, the presumption would be that it was for a present debt due, and to that extent
subsequent incumbrancers and purchasers would have notice of this prior incumbrance, by the record. And we have seen, that if the fact was otherwise, that instead of its being for a present indebtedness, some part, or all, was for a future indebtedness, incurred for advances or responsibilities assumed, which were agreed to be made and incurred at the time, the judgment would be an available security, when made, to the amount so specified, if there should be no intervening equity arising to take preference. But the adjudged cases show that if the debt amounted to the sum specified in the condition of the bond at the time of its execution, or advances were subsequently made as agreed upon at the time, to that amount, the judgment could not be available as a security for any additional indebtedness, for other advances or liabilities, although in the end, by payments made or funds received by the creditor of the debtor, the amount of the moneys advanced from time to time should be satisfied, so that the balance did not exceed the sum specified in the security. It could not be regarded as a continuing security covering thefinal balance which might be found due to the creditor from the debtor, after charging the original debt and subsequent advances and responsibilities, and crediting the moneys received from the debtor from time to time, although such balance should be no larger in amount than the sum specified in the security to be secured.
When the creditor has received of the debtor moneys upon the security taken, equal in amount to the sum specified therein, to be secured, whether given for a present debt or for future advances, it becomes satisfied and extinguished. I think the evidence in this case shows that the bond and warrant of attorney, *Page 163 
upon which the judgment was entered up, were given to Williams, to secure to the firm of Williams Co. the payment of $20,000, by Brown Starkweather, on account of responsibilities which had been already or were shortly thereafter to be assumed, and which were so assumed for them, to that amount, by accepting drafts drawn or to be drawn by them, to run from two to four months; and that the evidence warrants the inference that Williams Co., for the period of several years thereafter, and down to about the time of the death of Brown, were in the habit of accepting other like drafts from time to time for Brown Starkweather, and that they were in the habit during the same time, generally, of providing Williams Co. with funds to pay them at maturity; and that whatever balances have been found to be due to Williams 
Co. since the giving of the bond and warrant, they have been made up of the difference between the amount of such acceptances made since the bond was given, and the money so provided for the payment, by Williams Co., in addition to the acceptances and responsibilities, to secure which the sum specified in the bond was designed. I also think that the evidence shows at least two periods of time after the bond was given, when Brown 
Starkweather ceased to be the debtors of Williams Co. upon thebond or judgment, although there may have been no time after the 16th day of October, 1837, or even after the giving of the bond, when Brown Starkweather were not indebted to Williams Co. in as large a sum as $20,000, for payments made on acceptances and indorsements of bills of exchange for them. First, the witness Williams testified that from his recollection of the state of the accounts, which Williams Co. kept, in which they charged Brown Starkweather with acceptances and credited them with moneys received, he had no doubt but that they received from them between April and October, 1835, as much money as the drafts or acceptances then outstanding; which I understand to mean the time the bond and warrant were given in April. If so, the judgment became satisfied, it having been given to indemnify against acceptances which Williams *Page 164 Co. had made at or before the date of the bond, or which they made shortly thereafter; it could not serve the purpose of a security for a new indebtedness, in addition to the debt of $20,000 for which it first stood as security. Again, although the witness testified that on the 16th day of October, 1837, Brown 
Starkweather were indebted to Williams Co., in the sum of $20,608, and from that time down there was at all times a greater liability than $20,000, that on the 20th February, 1839, the balance was $22,742,26, and at the time the judgment was assigned to the defendant the amount due them was more than $30,000; yet he also testified that since the 16th day of October, 1837, Williams Co. had received on account of Brown Starkweather, a larger amount of money than was due to them at that date.
The balances of $20,000 and upwards due to Williams Co. at all times after October, 1837, were evidently made up from time to time by payments made on new acceptances, made after the acceptances contemplated to be made and secured by the bond, had been made, and after the indebtedness originally created to secure which the bond was given had been satisfied. For we see by the evidence, that about half of the balance of the $22,742,26, found due on the 20th February, 1839, was for money which Williams Co. had paid for their indorsements of two bills of exchange made about the 7th March, 1837, nearly two years after the bond had been given, and in the meantime Williams Co. had received of Brown Starkweather two mortgages of $10,000 each, and several notes on which they had received in cash about $10,000 more.
Now if it be true, as I assume, that the evidence shows that Williams Co. were liable to the amount of $20,000 on account of their acceptances for Brown Starkweather, between April and October, 1835, and had received from them as much as that sum in money to apply on their account, the bond and warrant of attorney became satisfied, and of course there could be nothing due or secured by the judgment when it was entered up; or if Williams 
Co. received, (as Williams testified that they *Page 165 
did) from Brown Starkweather, as much, or a larger amount of money on their account after the 17th day of November, 1837, than was then due to them from Brown Starkweather; the judgment, if a valid security for the payment of any balance when entered, became satisfied by such receipts of money, and application by Williams Co. subsequently and before the assignment; consequently the defendant did not acquire any interest in the premises, under his sale and purchase.
There is, it is true, no direct evidence in the case showing any express application of the moneys paid by Brown 
Starkweather, upon the judgment, at the time of the receipts of the money; but the manner in which Williams Co. kept the accounts between them from 1835, and ascertaining the balance due to them from time to time, show that the indebtedness for which the bond was given, on which the judgment was entered, was brought into the account and made a part of it from the beginning, and that both parties intended to apply, and did in fact apply the first receipts of money to the first items of indebtedness. Williams Co. from the beginning kept an account, in which they charged Brown Starkweather with their acceptances and credited them with money when received, and from that account the balance due, from time to time, was found. (Allen v.Culver, 3 Denio, 284.)
The defendant objects that the complainants show no ground for equitable relief, that they have a perfect remedy at law. The answer to that is, that he has omitted to raise the objection in his answer, and that it comes too late at the hearing. (Le Roy
v. Platt, 4 Paige, 77.)
Other questions have been made by the parties, but I think it is unnecessary to consider them, having come to the conclusion that the evidence clearly shows that the debt and responsibilities which the judgment was given to secure, were fully satisfied by Brown Starkweather before the assignment of the judgment to the defendant.
The judgment of the supreme court and the decree of the *Page 166 
vice chancellor should be reversed, and a decree entered according to the prayer of the bill, with costs in the courts below.