W. L. DEVELOPMENT CORP., Respondent, v TRIFORT REALTY, INC. et al., Defendants, and ACE HARDWOOD FLOORING CO. INC., Appellant.

Second Department, July 18, 1977

*Gerald Zisholtz* for appellant.

*Abrams & Herman (Norman Abrams* of counsel), for respondent.

SHAPIRO, J. In an action to foreclose a mortgage on certain lots located in Kings Park, Smithtown, New York, one of the defendants, the Ace Hardwood Flooring Co., Inc. (Ace), the holder of a mechanic's lien, appeals from a judgment of foreclosure and sale of the Supreme Court, Suffolk County, entered October 27, 1976, after a nonjury trial.

### THE ISSUE

The issue on which this appeal turns is whether a supplier of materials and labor (the plaintiff-respondent) which has

obtained a mortgage from the owner to secure the value not only of work done to improve the owner's premises up to the date of his purchase thereof, but also for work to be done thereafter in improving the premises, can thereby obtain preference over another supplier of labor and materials used for the improvement of the premises. We hold that he cannot.

THE FACTS

The plaintiff, W. L. Development Corp. (W. L.), is a builder and seller of homes in residential subdivisions. On July 30, 1973 Muriel White and Sherry Linder contracted to sell the 77 lots of Harbor Trees, Section 3 in Kings Park. Twenty-seven lots were to be sold to the plaintiff corporation, which is wholly owned by their husbands, Samuel Linder and Stanley White, and the remaining 50 were to be sold to the defendant mortgagor, Trifort Realty, Inc. (Trifort). Simultaneously with the execution of the contract to purchase the land, W. L. and Trifort signed an an agreement which declared that W. L. "is about to commence construction of all off-site public improvements within the area shown on the Map of Harbor Trees, Sec. 3 which said improvements will enure to the benefit of the Owner and W. L." and that "the parties hereto wish to provide by written agreement for the construction and installation of said public improvements and for the payment by the Owner to W. L. for a proportionate share of the cost of said work." The remaining relevant portions of the agreement read as follows:

"1. The work to be performed by W. L. pursuant to this Agreement is detailed on Exhibits 'A' annexed hereto.

"2. The Owner shall pay W. L. for the work performed $5,400.00 for each building plot. Payment shall be made by the Owner to W. L. on or before 3 years from the date the Owner acquires title to the subject property under the contract of sale between the Owner and Sherry Linder and Muriel White. Payment shall be secured by the Owner executing, acknowledging and delivering to W. L., simultaneously with delivery to the Owner of a deed conveying title to the subject property to the Owner, a bond or note satisfactory to W. L. in the principal sum of $270,000.00 and interest thereon which bond or note shall provide for the payment of said indebtedness with interest thereon as follows:

"(a) The entire unpaid principal indebtedness with interest then accrued thereon shall become due and payable on or before 3 years from the date of execution thereof.

"(b) Interest shall be paid on said indebtedness or on the amount thereof from time to time remaining unpaid computed from the date hereinafter provided and at the rate of SEVENTEEN and ONE-HALF (17½%) Per Cent per annum and shall be payable quarter-annually thereafter.

"(c) Said bond or note shall be secured by a mortgage covering the Premises which mortgage shall contain like terms of payment as in said bond or note provided either specifically or by reference thereto, or by incorporation of the terms of said bond or note in said mortgage.

"(d) Beginning on the date of closing of title and every 30th day thereafter W. L. shall furnish the Owner with a summary of the work performed, the cost of said work to date and the amount actually paid to date. The mortgage is intended to and shall be deemed to secure to W. L. repayment of the cost of said work, and interest shall [50/77] accrue on said fraction of the cumulative cost of the work actually paid for as reflected in the monthly summaries furnished to the Owner commencing with the date of delivery of the first summary. Each monthly summary shall contain a statement of the total cumulative cost to date, and the Owner's fractional share thereof which latter sum shall be deemed the amount then secured by the mortgage.

"Payments shall be verified by photocopies of checks and by an affidavit executed by an officer of W. L.

"(e) If the Owner of the mortgaged premises is unable to obtain a Certificate of Occupancy for any of the homes it may have constructed upon the mortgaged premises because the public improvements have not been completed or brought to a stage of completion satisfactory for the issuance of a Certificate of Occupancy, then the Owner of the mortgaged premises shall send written notice to the holder of this mortgage advising that a Certificate of Occupancy has been refused by the Building Department and from the date of said notice, interest will be suspended on that portion of the mortgaged indebtedness which bears the same ratio to the then unpaid mortgage balance as the number of plots for which Certificates of Occupancy were refused bears to the total number of

plots covered by this mortgage. Interest shall be reinstated as of the date of issuance of the Certificate of Occupancy.[1]

"3. The mortgage to be executed by the Owner shall contain a provision that the mortgagee shall, upon request of the Owner of the premises release portions of the mortgaged premises upon the terms and conditions set forth in Exhibit 'C' attached hereto.

"4. The said mortgage shall be drawn on the standard forms of the New York Board of Title Underwriters and shall be drawn by the attorney for W. L. at the expense of the Owner who shall also pay the mortgage recording tax and recording fees.

"The mortgage shall contain * * * the following provisions:

"(a) This mortgage shall be subordinate to the lien of any building loan mortgage or mortgages to be executed by the mortgagor herein, to a New York State lending institution on any of the lots covered by the lien of this mortgage, and to all advances made or which may hereafter be made thereon * * * to the extent of the amount loaned as a building loan advance on each of said lots provided: (i) at the time of such subordination the mortgagor pays to the mortgagee in reduction of the mortgage indebtedness a sum of money for each lot for which a building loan mortgage is granted, which sum shall be equal to the result obtained by dividing the then unpaid principal balance of this mortgage, as calculated and verified pursuant to other provisions of this agreement by 50 [or the total number of unsubordinated plots, whichever is less] but said sum shall not in any event exceed $2,700.00 per plot (ii) such subordination shall not be deemed to extend the maturity date of this mortgage (iii) the mortgagor will, upon the maturity date of this mortgage or simultaneously with conveyance of title of each lot, whichever is sooner, pay to the holder of this mortgage the release consideration provided herein and accrued interest, less any sums paid in reduction of the mortgage indebtedness, pursuant to this provision at the time of execution of the building loan agreement, and shall be entitled to receive a release of said lot from the lien of this mortgage.

"(b) If at the time of conveyance of title to a lot the public

1. In addition to any other remedies available to the owner it shall have the right to do the work at its own expense and deduct the cost there from the mortgage. (Footnote in original.)

improvements with respect to said lots are not completed a percentage of the release consideration equal to the percentage of the incompleted work shall be deposited by the mortgagor in escrow with the seller's attorneys, Abrams & Herman, and may be released by the escrowees upon receipt by them of an Affidavit executed by an officer of W. L. Development Corp. certifying that the work has been completed and paid for.

"(c) The principal balance shall immediately become due and payable at the option of the mortgagor upon a conveyance or further encumbrance of the mortgaged premises without the mortgagee's consent.

"5. W. L. agrees to commence construction immediately after the filing of the Subdivision Map and diligently proceed with the work until completion thereof." (The bracketed matter was added to the typed agreement in ink.)

On January 28, 1974, pursuant to its contract, Trifort acquired title to the 50 lots and simultaneously executed a bond and mortgage to the plaintiff, W. L. in the sum of $270,000, payable on or before January 10, 1977, with interest to be computed from February 10, 1974 at the rate of 16½% to be paid quarterly. The mortgage was subject to a first mortgage in the sum of $374,000 held by a corporation and a purchase-money mortgage in the sum of $480,000 held by the sellers. The mortgage was recorded on February 11, 1974.

When Trifort received title to the 50 lots, its 50/77th share of the cost of the off-site public improvements which W. L. was required to provide for Trifort's 50 lots by its agreement of July 30, 1973, was $52,643 (the improvements consisted of road drainage, curbs, sidewalks, sewer main and laterals to the property line, electric and gas lines to the property line, roads, water mains, rough grading of all plots and operation of the sewerage collection system). By February 10, 1975 W. L.'s work under the contract was substantially completed and Trifort's maximum cost obligations under the contract, $270,000, had been reached.

In November, 1974 the appellant, Ace, began installing oak flooring in the houses Trifort was building and it continued to do so until September 26, 1975. Ace's total bill for material and labor was $35,017.50, of which it received from Trifort only $9,000 though it had billed Trifort for the total amount due. On December 3, 1975 Ace filed a mechanic's lien for the balance of $26,017.50 owed to it by Trifort. As of October 10, 1975 the mortgage debt owed by Trifort to W. L. was $155,250.

When the quarterly interest payment due on that day was not paid, W. L. initiated the instant foreclosure action. At the time of the trial of the action, June 17, 1976, the principal balance remaining unpaid on the mortgage was $130,950.

Though the complaint in the foreclosure action listed a large number of defendants, the only defendants who opposed the action were Trifort and Ace. Only Ace appeals from the judgment of the trial court, dated October 25, 1976, granting the plaintiff a judgment in foreclosure of the mortgage.

### THE DECISION OF SPECIAL TERM

In its decision the trial court rejected Ace's contentions that the bond and mortgage given by Trifort to W. L. was a subterfuge to avoid the mandates of the Lien Law and that they improperly granted the plaintiff a priority over other mechanics' lienors who should either have a priority over the plaintiff's mortgage or, at the very least, should be declared to be on a parity with the plaintiff. In so doing the trial court (citing *Knapp v McGowan*, 96 NY 75 and *Truscott v King*, 6 NY 147) declared: "The validity of a mortgage to secure future advances or future obligations has been firmly established and is clearly legal".

### THE LAW

*Knapp* and *Truscott*, however, both dealt with moneys to be advanced and not with work thereafter to be done. In *Knapp* the issue was whether a debtor, acting in good faith, could mortgage a portion or the whole of his property to secure existing claims as well as future loans and advances. The court there said (p 86): "That any creditor, whether solvent or insolvent, may, acting in good faith, mortgage a portion or the whole of his property to secure one or more of his creditors for any indebtedness, cannot be doubted. The referee found that Roche was at the time solvent, and it has never been questioned that such a debtor may mortgage his property to secure existing claims as well as future loans and advances." But "loans and advances" are not the same as "future obligations". "Loans and advances" involve receipt of money. "Future obligations", as the trial court read it, included "future * * * work". Similarly, the *Truscott* case, too, involved advances of money, not work to be done. The trial court cited *Ackerman v Hunsicker* (85 NY 43) as authority for the state-

ment that "[t]he use of a mortgage as a security instrument for future advances or work has been a recognized method of operation in the business community". But in *Ackerman* (p 46) the mortgage given was "to secure the mortgagee, for any indorsements he had made, or should thereafter make, for the mortgagor, or the firm of Levi & Miller, to the amount of $6,000." There was no question of the mortgage being made for future work.

The same is also true of the two additional cases cited by the plaintiff, *Mead v York* (6 NY 449) and *Huntington v Kneeland* (102 App Div 284). Both of those cases involved mortgages given for moneys to be advanced for purposes other than for work to be done in improving the premises which were the subjects of the mortgages. Thus, no authority is cited, and I have been unable to find any in the case law, supporting the propriety of the open-ended mortgage device used by the plaintiff here to secure for itself priority over mechanics' lienors with respect to the recovery of the agreed price for the services it had supplied and was to supply to Trifort for improvement of the real property.

The appellant contends that the bond and mortgage given to the plaintiff by Trifort are invalid under section 7 of the Lien Law, which deals with liability for advance payments, collusive mortgages and incumbrances. In relevant part it provides: "Any payment by the owner, contractor or subcontractor upon a contract for the improvement of the real property, made prior to the time when, by the terms of the contract, such payment becomes due, for the purpose of avoiding the provisions of this article, shall be of no effect as against the lien of a subcontractor, laborer or materialman under such contract, created before such payment actually becomes due. A conveyance, mortgage, lien or incumbrance made by an owner of real property, for the purpose of avoiding the provisions of this article, with the knowledge or privity of the person to whom the conveyance is made or in whose favor the mortgage, lien or incumbrance is created, shall be void and of no effect as against a claim on account of the improvement of such real property, existing at the time of the making of the conveyance or the creation of such mortgage, lien or incumbrance."

Here, however, there is no evidence that Trifort, the owner, made any payments for the improvement to his real property by W. L. "prior to the time when, by the terms of the contract, such payment" became due, or that any payments it

had made were for the purpose of avoiding the provisions of article 2 of the Lien Law, or that its giving of the bond and mortgage sought to be here foreclosed was "for the purpose of avoiding the provisions" of the article. Hence, appellant's reliance on *Foxson v Elmus Bldg. Corp.* (276 NY 30) is misplaced since there, unlike here, it was clear that both the maker and receiver of the mortgage had knowledge of the existence of other claims by persons who had furnished materials and labor on the mortgaged premises *prior* to the date of the making of the mortgage. What *Foxson* held (pp 32-33) was that there was no need to establish that the mortgage holder had been motivated by "evil, sinister, fraudulent intent", but only that his purpose "was to attempt to take precedence over those who already possessed claims and thus to avoid the provisions of the statute". But here there is no evidence of any such purpose since, when the agreement and mortgage were made, there were no persons who possessed claims for providing either labor or materials for the improvement of the property.

Neither does the literal wording of section 13 of the Lien Law resolve our problem. That section, which deals with priority of liens, provides, in relevant part: "(1) A lien for materials furnished or labor performed in the improvement of real property shall have priority over a conveyance, mortgage, judgment or other claim against such property not recorded, docketed or filed at the time of the filing of the notice of such lien, except as hereinafter in this chapter, provided; over advances made upon any mortgage or other encumbrance thereon after such filing, except as hereinafter in this article provided; and over the claim of a creditor who has not furnished materials or performed labor upon such property, if such property has been assigned by the owner by a general assignment for the benefit of creditors, within thirty days before the filing of either of such notices; and also over an attachment hereafter issued or a money judgment hereafter recovered upon a claim which, in whole or in part, was not for materials furnished, labor performed or moneys advanced for the improvement of such real property; and over any claim or lien acquired in any proceedings upon such judgment. Such liens shall also have priority over advances made upon a contract by an owner for an improvement of real property which contains an option to the contractor, his successor or assigns to purchase the property, if such advances were made

after the time when the labor began or the first item of material was furnished, as stated in the notice of lien. If several buildings are demolished, erected, altered or repaired, or several pieces or parcels of real property are improved, under one contract, and there are conflicting liens thereon, each lienor shall have priority upon the particular part of the real property or upon the particular building or premises where his labor is performed or his materials are used. Persons shall have no priority on account of the time of filing their respective notices of liens, but all liens shall be on a parity except as hereinafter in section fifty-six of this chapter provided; and except that in all cases laborers for daily or weekly wages shall have preference over all other claimants under this article."

Here the mortgage sought to be foreclosed was on record for 22 months before the appellant filed its notice of lien and some 9 months before it began supplying and installing the oak flooring which gave rise to its lien in the Trifort houses. Furthermore, the plaintiff had completed its work under the agreement and mortgage, i.e., its "advances" thereon, almost 10 months before Ace filed its notice of lien. It appears, however, that at least during the period from November, 1974 to February 10, 1975, when the plaintiff completed its services, both it and Ace were simultaneously providing materials and labor to improve Trifort's property.[2]

Hence, since neither the literal wording of the Lien Law nor the cited cases resolve the questions raised by this appeal, I turn to the considerations reflected in the Lien Law and the interpretative decisions thereunder. Subdivision (1) of section 13 of the Lien Law dealing with priorities provides: *"Persons*

---

2. The appellant, in its brief, contends that the trial court erred in holding that the plaintiff's mortgage complied with section 13 of the Lien Law. It makes no contention that the trust provisions of article 3-A of the Lien Law apply to its lien claim. The mortgage here did contain the usual boiler-plate language: "That the mortgagor will, in compliance with Section 13 of the Lien Law, receive the advances secured hereby and will hold the right to receive such advances as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose."

But here there was no advance of money by the plaintiff, the mortgagee, to the owner, the mortgagor. There was only the provision of labor and materials by the mortgagee to the mortgagor and the cost of providing such labor and materials covered by the mortgage was never received by the owner, but the payments made by the owner from the time of its purchase of the real property up to the time of its default were received by the plaintiff as reimbursement for the cost of the materials.

*shall have no priority on account of the time of filing their respective notices of liens, but all liens shall be on a parity* except as hereinafter in section fifty-six of this chapter provided; and except that in all cases laborers for daily or weekly wages shall have preference over all other claimants under this article" (emphasis supplied). Neither exception is applicable here. The basic policy is thus made clear—all other "liens shall be on a parity" regardless of when they were filed and "[c]ourts are required to give the mechanics' lien statute a liberal construction in order to effectuate the beneficial interests and purposes thereof (Lien Law, § 23)" *(Monroe Sav. Bank v First Nat. Bank of Waterloo,* 50 AD2d 314, 319; see, also, *Wahle-Phillips Co. v Fitzgerald,* 225 NY 137, 141).

Here the mortgage sought to be foreclosed was clearly given to secure payment to the mortgagee of moneys to become due to it from the owner, Trifort, for improvement of its real property. The services to be provided and the materials to be furnished are all lienable improvements within the meaning of subdivision 4 of section 2 of the Lien Law. The fact that the plaintiff, itself a developer of large subdivisions and, therefore, primarily a seller of real property, undertook to protect the claim it already had against Trifort for the 50/77th share of those costs it had already incurred when Trifort took title to its 50 lots, and the balance it would incur up to a possible maximum of $270,000—$5,400 per lot—by taking a mortgage from Trifort instead of relying on its rights under the Lien Law—does not alter the nature of the transaction. The rights of the appellant as a third-party mechanic's lienor should not be concluded by the fact that the plaintiff and Trifort called the instrument which they entered into a mortgage (see *Cagliostro v Galgano,* 69 Misc 321; see, also, *Bassett v Salter,* 25 NYS2d 176, affd 262 App Div 967). Since no mortgage, as such, was proper under the Lien Law, we treat the plaintiff's mortgage lien as a mechanic's lien, thus putting it on a parity with the appellant's lien. Accordingly, the judgment of foreclosure and sale should be reversed and the action remanded to Special Term for the entry of an appropriate judgment in accordance with the views here expressed.

MARTUSCELLO, J. P. (dissenting). In July, 1973 Muriel White and Sherry Linder contracted to sell 27 lots of an undeveloped tract of 77 lots to the plaintiff corporation, whose principals were their husbands; the remaining 50 lots were sold to the defendant Trifort Realty, Inc. (Trifort).

All of the parties contemplated construction of one-family residences on their lots. It was known that certificates of occupancy would not be issued until there had been installed improvements for the entire tract, such as roads, curbings, drainage and sewer lines. The plaintiff took upon itself the obligation to install such improvements for the entire 77 lots and Trifort obligated itself to pay 50/77th of the cost thereof, with a ceiling of $270,000 (i.e., $5,400 per lot). It was agreed that such obligation was to be secured by a mortgage.

Trifort acquired title to the 50 lots on January 28, 1974 and simultaneously executed and delivered a bond and first mortgage to the plaintiff in the sum of $270,000. At that time, the plaintiff had already expended $52,643 on behalf of Trifort as the latter's share of the general improvements, and continued its work thereon. By February, 1975 the work was substantially completed and the $270,000 ceiling had been reached.

Defendant Ace Hardwood Flooring Company (Ace) was engaged by Trifort to install flooring on the houses on Trifort's lots. Ace started work on November 8, 1974 (more than nine months after the aforesaid mortgage was recorded); its work was completed on September 26, 1975. On December 3, 1975 Ace filed a mechanic's lien for the balance of $26,017.50 owed to it by Trifort. Prior thereto, the plaintiff had instituted the action herein to foreclose its mortgage for nonpayment of an installment of interest due October 10, 1975; the principal balance due when the trial commenced was $130,950.

I agree with Special Term that there was nothing sinister in the fact that the entire tract had been owned by the wives of the stockholders of the plaintiff corporation, since there was no invidious advantage such as might have been obtained by inside information. Indeed, the close relationship between the common grantors and the principals of the plaintiff corporation makes it certain that had any question of the legal effectiveness of the proposed mortgage been raised, the grantors simply could have added $5,400 to the price of each lot. The majority opinion herein concedes that when the mortgage to the plaintiff was agreed and later executed, there were "no persons who possessed claims for providing either labor or materials".

The fact pattern here is not one where (for example) a plumbing contractor, contrary to customary practice, insists on a mortgage to secure its future services in order to obtain priority over other and similar putative mechanics' lienors

(such as electrical or carpentry contractors). Such a mortgage would indeed be suspect as an intentional and unfair evasion of the protections commonly provided by the Lien Law (see, e.g., §§ 13 and 23 thereof).

The plaintiff had a legitimate interest in arranging for roads, sewer lines and other matters relating to the entire tract of 77 lots. It made economic sense for such work not to be done piecemeal by the grantees of the two sets of lots, and it was certainly fair that Trifort should pay its proportionate share, and to furnish security therefor. The plaintiff went further and agreed to a ceiling (which, in fact, was exceeded) to Trifort's costs.

The plaintiff had no control over the time Trifort would take to put in its foundations or lay its floors. There is no reason, in equity, why the efficacy of the mortgage, as the agreed modality of security for Trifort's indebtedness for its pro rata benefits for the general improvements to the entire tract, should depend on when Trifort chose to start construction. The agreement, valid and honest when made, should not become invalid because of circumstances that are solely in the control of the obligor.

The decision herein constitutes an impairment of the obligations of the contract that the parties chose to make. I see no violation of public policy in accepting the document as a mortgage under these unique circumstances; there was no fraud in intent or in act. Therefore, the equitable power to alter the specified essence of an agreement (e.g., to consider a deed as a mortgage) should not be exercised. The intent of the parties was properly expressed in the form of a mortgage (see *Knapp v McGowan*, 96 NY 75; cf. 38 NY Jur, Mortgages and Deeds of Trust, § 20, p 47); there is no warrant in classifying it as an incipient mechanic's lien.

I add the following, as stated by Special Term: "The plaintiff's mortgage was a matter of public record over nine months before the defendant Ace commenced work on the improvement. If the defendant did not want to work under those circumstances it did not have to do so. Having chosen to do so it cannot now complain about the superiority of plaintiff's mortgage."

LATHAM and O'CONNOR, JJ., concur with SHAPIRO, J.; MARTUSCELLO, J. P., dissents and votes to affirm the judgment, with an opinion.

Judgment of the Supreme Court, Suffolk County, entered October 27, 1976, reversed, on the law, with costs to appellant payable by plaintiff, and action remanded to Special Term for further proceedings in accordance with the opinion herein by SHAPIRO, J.