# CHARLESTON.

BETTIE C. WAIT, EXECUTRIX v. HOMESTEAD BUILDING
ASSOCIATION *et al.*

Submitted February 5, 1918.   Decided February 26, 1918.

1. PAYMENT—*Failure to Require Application—Appropriation.*

Where a defaulting treasurer of a building association, both being insolvent, pays to the receiver of the latter in partial discharge of the defalcation, part only of which is secured, money acquired long after severing the trust relation, and in which the association had no direct interest, without exercising the right lawfully his to require application of the payment, the mere act of the receiver in depositing the money in bank to the credit of his account as such does not operate as an appropriation of the payment to any particular item or items of the account in the absence of proof of a statement rendered the treasurer or his personal representative after his death showing the payment and balance remaining unpaid after allowing the payment as a credit therein.   (p. 705).

2. SAME—*Application—Revocation.*

Application of a payment once made either by direction of the debtor or in the absence of such direction by the creditor cannot be revoked except with the assent of both.   (p. 705).

3. SAME—*Failure to Make Application—Equitable Disposition.*

If, however, there be no such appropriation, the court having control of the fund and jurisdiction of the parties interested will make a just and equitable disposition of the payment, the rights and interests of all parties concerned being considered.   (p. 706.).

4. SAME—*Secured and Unsecured Claims—Application.*

Where the defaulting treasurer of an insolvent building association, he also being insolvent, whose indebtedness thereto is secured in part only, does not direct application of a payment and the receiver enters it merely as a general deposit in the bank to the credit of the account, which does not appear to have been balanced, or if balanced that the treasurer had knowledge thereof, such general deposit does not constitute an application to the discharge of either the secured or unsecured liability, wherefore the court having control of the fund and jurisdiction of the parties interested, will, all interests concerned being considered, apply the payment to the unsecured rather than to the secured indebtedness where it appears that the money paid by the treasurer was out of property free from the equities of the sureties and was acquired

long after he had ceased to act in behalf of the association, and against which property it then had no valid lien or claim except the mere liability due to the defalcation.   (p. 706).

(Miller, Judge, absent).

Appeal from Circuit Court, Wood County.

Suit by Bettie C. Wait, executrix, against the Homestead Building Association, Union Trust & Deposit Company of Parkersburg, receiver, and others.  Decree for plaintiff, etc., and the receiver appeals.

*Reversed and remanded.*

*F. P. Moats,* for appellant.
*Wm. Beard,* for appellees Wait and Smith.
*W. M. Straus,* for appellees Straus & Smith and others.
*Reese Blizzard,* for appellee Peadro.

Lynch, Judge:

The decree reviewed upon this appeal adjudicated the liability of the estate of J. Henry Fischer to the Union Trust & Deposit Co. of Parkersburg, receiver of the Homestead Building Association, an insolvent corporation organized for the purpose of encouraging industry, frugality and saving, and the acquiring and improving of real estate as and for residences among and by its members and stockholders. Fischer was elected treasurer upon the date of its organization and continued thereafter to act as such agent until March 1, 1904, when he voluntarily severed his official connection with the corporation, which in the meantime had become and then was insolvent, and the Union Trust & Deposit Co. had been appointed receiver of the association's assets by a former decree pronounced in this cause.  He entered annually into bonds guaranteeing his fidelity to the trust reposed in him, the date of the last bond being in 1900.  The duties intrusted to him were to collect the dues of the members and stockholders, keep an accurate account of the collections, deposit them to the credit of the association in the Second National Bank and out of them pay by check all orders drawn on him pursuant to requirements of the board of directors of the association.

The insolvency of the Homestead Building Association was due apparently not to the dishonesty of Fischer but to the breach of the trust reposed by him in the agents employed in the conduct and management of his store, where it appears members of the association paid and he received dues and interest charged to them, contrary to the rules and regulations of the association, which permitted such payments only at its office and on the regular weekly meetings of the board of directors, and not elsewhere or at other times.

Upon this inquiry there are involved only three annual bonds, dated respectively in the years 1898, 1899 and 1900, in which the obligors are identical, liability on prior bonds being barred by the statute of limitations as held upon the former appeal, the opinion being reported in 76 W. Va. 431, 85 S. E. 637. After the remand, the cause was referred to a commissioner to ascertain and report, first, the amount due the Homestead Building Association chargeable to the estate of J. Henry Fischer on account of collections and disbursements made by him from August 16, 1898, the date of the first of the last three bonds, to March 1, 1904, the date of his resignation as such agent, excluding such liability as may have accrued prior to August 16, 1898; second, the amount due the Homestead Building Association from the estate of Fischer between August 16, 1898 and June 30, 1901, chargeable to each of the three bonds given by him and for which his sureties are liable.

To the report showing the result of the investigation made pursuant to the direction of the order, exceptions were taken and filed by counsel representing the parties interested. The decree reviewed overruled each exception, confirmed the report and fixed the liability as the commissioner found it to be, namely, $58,670.93, against the estate of J. Henry Fischer, including interest from March 1, 1904, and against the sureties on the three bonds $14,736.32 as of the same date, that amount being part of the larger one for which there was only a partial liability on the sureties, the transactions of Fischer as such agent occurring between June 30, 1901, and March 1, 1904, not being covered by their contract to indemnify the Homestead Building Association against the mismanagement

of its funds and as against which transactions the Homestead Building Association had no protection other than the solvency of Fischer.

For the sake of perspicuity and clarity the report states the account rendered under four headings: "First Bond Period", "Second Bond Period", "Third Bond Period", "No Bond Period". Acting upon the assumption that credits should be applied in satisfaction of the earliest items of an indebtedness, the commissioner credited to the balance found due at the end of the first bond period two payments made by Fischer to the receiver, one for $1500.00 on August 16, 1904, the other $1584.80 on September 13, 1904 aggregating $3084.80. Against the correctness of this application of these payments the receiver protests and insists that if it be at all proper to credit them as of that period, the method adopted by the commissioner was prejudicial to the interests he represents. Instead of so applying them, he says that having been paid without direction by Fischer as to the liability in satisfaction of which they should be applied, it is within his power, not the power of the sureties, to determine where the credit therefor shall be placed; that is, against what defalcation, that for which the sureties obligated themselves or that for which there is no guarantee save that of Fischer only or his estate.

To this observation the sureties through counsel representing them reply that by entering these items on the books of the bank as general credits against the debit side of the account, the receiver made such appropriation as concludes him, and through him the Homestead Building Association. In this manner there are presented for adjudication two questions: Does such an entry imply an actual appropriation of these items thereby foreclosing further inquiry quoad the correctness and propriety of the credits? If not, where shall they be applied, to the secured or unsecured indebtedness created by the defalcation?

The aggregate of these items was not paid or received as collections from members or stockholders of the Homestead Building Association. They were paid and received after Fischer had resigned the office of treasurer. Thereafter he

did not collect dues. There were none to collect. Evidently from his individual financial resources, he derived the money contributed to the partial liquidation of the liability incurred through the mismanagement of the funds intrusted to him; and it is conceded he did not designate the manner of their appropriation. Through Fischer's failure to exercise the primary right which the law concedes to him, the receiver in' his representative capacity lawfully possessed the secondary right to apply the credits as he should elect. If, by depositing items on the credit side of the bank account, the receiver exercised the right accorded to him upon the failure of the debtor to declare to what debt they should be applied, that credit cannot now be altered by a reapplication either by the receiver or by the decree. A discretionary right once exercised cannot ordinarily be withdrawn without the consent of the parties interested in the transaction. *White* v. *Costïgan*, (Cal.) 72 Pac. 178; *Halstead* v. *Griffin*, 173 Ill. App. 551; *Jackson* v. *Bailey*, 12 Ill. 159; *Chapman* v. *Com.*, 25 Gratt. 721.

Among the earliest opinions, if not the first one, treating of this subject, is Clayton's case, a branch of *Devaynes* v. *Noble*, 1 Merivale 530, 3 Eng. Rul. Cases 329, 336, where, after acknowledging the primary right of a debtor to restrict the application of a payment voluntarily made, as he may elect, and in the absence of such an election, the secondary right of the creditor to apply the payment so as to inure to his own benefit, the court said: "But in the case of an account current, such as a banking account, there is no room for any other appropriation than that which arises from the order in which the receipts and payments take place and are carried into the account. * * * The appropriation is made by the very act of setting the two items against each other." This rule seems to be recognized generally in England as the most equitable one, except in cases involving the misappropriation of trust funds. For English cases citing, discussing, following and distinguishing Clayton's case, see 2 Woods & Ritchie, Digest of Cases Overruled, pp. 2089, et seq. It is followed in some American courts, notably in Texas, New York, Alabama, Massachusetts and Virginia: *Willis* v. *McIntyre*,

70 Tex. 34; *Truscott* v. *King,* 6 N. Y. 147; *Harrison* v. *Johnson,* 27 Ala. 445; *Compton* v. *Pratt,* 105 Mass. 255; *Chapman* v. *Com., supra.* By other courts, however, the doctrine is criticised as being obiter because, before the controversy arose, Clayton saw the bank account and the entry of the credit, to which he then offered no objection but acquiesced in the appropriation, thus precluding revocation. *Pickering* v. *Day,* (Del.) 3 Houston 474, 95 Am. Dec. 291. Conceding the doctrine enunciated as inapplicable in view of the facts disclosed in the Clayton case, still the same rule is approved and followed in *Merriman* v. *Ward,* 1 J. & H. 371, 70 Eng. Repts. (Reprint) 790, the court saying: "It is also quite settled that keeping an account in the form proved in this case prima facie amounts to an appropriation by consent of the parties of each payment in discharge of the successive items of debt in order of time."

So distinguished a chancellor as Story, Judge of the Federal Circuit Court, later an associate Justice of the United States Supreme Court, in *Postmaster-General* v. *Furber,* 4 Mason 333 and *United States* v. *Wardell,* 5 Mason 82, approved the English rule as applicable to a debit and credit account. He said: "In such case the payments are to be applied to extinguish antecedent items on the debit side, there being no specific application by either party. It is the first item on the debit side of the account, that is discharged or reduced by the first item on the credit side. This doctrine was very deliberately settled by the Master of the Rolls in Clayton's case (1 Merivale 604 &c.) ; and it appears to me entirely consonant to equity and good sense, and the fair presumptions of intention as to appropriation, deducible from the nature of such transactions."

In *Jones* v. *United States,* 7 How. 681, an action on a postmaster's bond, the opinion adverts to Clayton's case, noting, however, as to the facts the difference that in the Jones case the debtor did not until the action was brought know that the department had applied payments made by him, the defendant sureties insisting that quarterly payments should be credited only to the liability of that quarter, but the court applied them to the earliest items covered by the bond, though

upon the face of the account the credit was given as of the quarter for which the payments apparently were made, but without direction by the debtor to that effect.

"It is a clear principle of law" said Chief Justice Marshall in *Mayor of Alexandria* v. *Patton*, 4 Cranch 320, "that a person owing money on two several accounts, as upon a bond and simple contract, may elect to apply his payments to which account he pleases; but if he fails to make the application, the election passes from him to the creditor. No principle is recollected which obliges the creditor to make the election immediately. After having made it, he is bound by it; but until he makes it, he is free to credit either the bond or the simple contract." To which Justice Story in *Kirkpatrick* v. *United States*, 9 Wheaton 724 adds: "If both omit it, the law will apply the payments according to its own notions of justice."

Recognizing the same rule as to the right of the debtor to determine in the first instance to what debt a payment shall be applied, and in the second the right of the creditor to apply it as he may elect in the absence of such direction, this court in *Buster* v. *Holland*, 27 W. Va. 510, point 4, syllabus, said: "There is no settled rule that the payments shall be either according to the presumed intention of the debtor or that they shall be applied in the manner most beneficial to the one or the other; but it devolves upon the court to apply them according to the justice of the particular case with a view to all its circumstances."

In *Chapman* v. *Com.*, 25 Gratt. 721 (Virginia Anno. Repts. 540), noting these general principles, it is held in effect that in the case of public funds in the hands of a collector acting under consecutive bonds in which the sureties are different, the law will so apply the payments, if possible, that the money collected under one bond shall be applied to the relief of sureties in that bond. This principle seems to have induced the result evidenced by the report and decree confirming it, as we gather from the report itself. Evidently, as remarked already, the $3084.80 was not paid within any of the three bond periods. It was paid after the end of the "No Bond Period", indeed after Fischer had voluntarily

severed his official relation with the Homestead Building Association.

Rather more nearly analogous are the facts involved here and in *Ryan* v. *Casto,* 76 W. Va. 315, neither of which deals with public funds.   Both deal with private bank accounts composed of debits and credits, the latter being payments made without direction as to the liability to be discharged by them and entered on the books of the bank in the credit column without indicating more than is implied in the mere formal entry; and·this, it is held in the Casto case, did not preclude the bank represented by Ryan as receiver from ''afterwards exercising its right to apply such deposits to the oldest overdrafts of its customer'', there having been no balancing of the account with notice to him.   No testimony discloses knowledge or information possessed by Fischer or his co-obligors of what disposition was made of the $3084.80. To the discharge of which items of his indebtedness it was applied he seems to have been indifferent.   It is impossible to determine the real nature of the deposit.   Neither the books of entry nor copies thereof are here.   Without these, it is assumed as in argument, that each of the two items composing that amount was entered on the books merely as a credit on Fischer's indebtedness.   This, we think, does not conclusively show an appropriation such as binds any party interested in the transaction, but as said in *Buster* v. *Holland, supra,* the court must apply them, the rights of the parties concerned being considered, as justice and equity may determine; and these, it seems to us, require the application to be made to the unsecured indebtedness agreeably with the well recognized rule that the most precarious debt is the one to be preferred: *Hempfield R. R. Co.* v. *Thornburg,* 1 W. Va. 261; *Pope* v. *Transparent Ice Co.,* 91 Va. 79; *Poling* v. *Flanagan,* 41 W. Va. 191, 200; *Bank of New Roads* v. *Kentucky Refining Co.,* 27 Ky. Law Rep. 645, 85 S. W. 1103.

But, it is argued, the interests of the sureties on the fidelity bonds are such as to warrant the credit of these items on the accounts for which they are liable without regard to the source from which the payments were acquired.   While this contention is plausible, it is against the weight of authority.

They were made from funds belonging to the principal nearly three years after the expiration of the third bond period and were free from equities in favor of the sureties to direct or to receive the benefit of the application of the fund: *Stamford Bank* v. *Benedict,* 15 Conn. 437; *Hansen* v. *Rounsavell,* 74 Ill. 238; *Pope* v. *Transparent Ice Co., supra; Bank of Wheeling* v. *Evans & Dorsey,* 9 W. Va. 373, 388; *Smythe* v. *New Eng. Loan and Trust Co.,* 12 Wash. 424; *California National Bank* v. *Ginty,* 108 Cal. 148; *Frazier* v. *Lanaham,* 71 Md. 131. To the debtor and creditor the law grants the right to control payments. If they fail to exercise that right, the court will do so for them as their rights and equities may seem to demand, notwithstanding the favor shown to sureties in consideration of their contracts. To do so would tend to defeat the object in procuring fidelity bonds. *Stamford Bank* v. *Benedict,* cited. To the application of this doctrine there is, it is true, a well recognized exception; where the money paid to the creditor is the identical sum or the very moneys for the security of which the surety has bound himself, the surety is equitably entitled to have the money applied to that debt.

The next cause of complaint against the decree is the failure to charge against the sureties bound by the first bond a balance due at the beginning of the period covered by it which, it is said, appears from the books of the Second National Bank, the bank in which the account of Fischer as treasurer of the Homestead Building Association was kept. Of this item, which is estimated by counsel for the receiver to be $9774.10, the commissioner says: "Considerable testimony was taken on this point and counsel do not agree on the amount. After careful investigation, your commissioner finds himself unable to fix any amount as even approximately correct. He therefore has stated the amount upon the assumption that the treasurer had no funds in his hands, due the association on the 16th day of August, 1898, and has charged him with funds collected on and after that date." No data appears upon this investigation which enables us to ascertain whether there was any balance in the bank to the credit of the Homestead Building Association on that day, and if so its

amount. If the commissioner, with the sources of informa-
tion available to him and not to us, could not determine the
amount approximately, we cannot do so, and counsel does not
tell us how he ascertained the amount for which credit is
sought.

There are charges in the report against the estate of Fischer
covering the period from and including August 25, 1903 to,
and including February 23, 1904, aggregating $25,924.55,
against which are allowed credits aggregating only about
$5000, less than the charges. Knowledge of these items is not
traced to Fischer. They are not in his handwriting nor the
handwriting of anyone acting in his behalf or with his au-
thority. The source from which they come appears obscure.
Mr. Moats, whose familiarity with the transactions, though
not acquired by participation in them originally but by an
investigation personally conducted on behalf of his client, the
receiver, is apparent, admits he was unable to determine
definitely whence they came, or by what authority they are
charged and credited. They were assembled by Warnick, an
accountant employed to examine the books of the association
and in whose handwriting the entries were made, who did not
testify in the case. In view of this obscurity and the un-
certainty as to the propriety of the debits and credits, both
should be eliminated from the account. For the most part
they neutralize one another, the difference favoring the estate
of Fischer slightly when compared with the otherwise as-
certained liability.

Our conclusion, therefore, is that the items composing the
$3084.80, paid as they were within the no bond period out of
funds free of any equities of the sureties on the fidelity bonds,
should be applied to the discharge of the liability incurred
within that period, and not as applied by the commissioner;
that the evidence is insufficient to warrant an alteration of
the report and decree to let in the item of $9774.10, alleged
to be funds in bank August 16, 1898, to the credit of the
Homestead Building Association; and that both the report
and decree should be altered to exclude the debit items aggre-
gating $25,924.55 and the relative credit items aggregating
approximately $20,258.23.

In executing the order of reference and ascertaining the data upon which to base his findings, the commissioner was authorized to consider any competent evidence theretofore taken and filed in the cause, whether oral or documentary. Of the latter class were the books of the Homestead Building Association, the blotters kept by Robert Alexander, the secretary, and the cashbooks kept by Fischer, the treasurer, from which, among others, the commissioner found and reported liabilities against the estate of Fischer and the sureties on his fidelity bonds. Complaint is made of the use of these documents on the ground of incompetency to bind either Fischer or his sureties because the entries thereon were not made by him or by his authority, and that he did not consent to the entries and did not know they were made.

The cashbooks, it is shown, were kept by Fischer and in them appear in his own handwriting many of the cash collections made by him from members and stockholders of the Homestead Building Association. Some not personally so written appear clearly to have expressly been authorized by him, and were made in his presence and the presence of the secretary upon different occasions at the regular weekly meetings of the Homestead Building Association, and at its office or place of business, and on other occasions at the house of Alexander or of his daughter, Mrs. Ferrell, who also was present with Fischer and her father at many of the regular weekly meetings. She describes with particularity and manifest intelligence and fairness what then was said and done by each of them as regards the blotters and cashbooks when she was aiding them in comparing and reconciling the accounts as they appeared on the books so kept.

Her testimony leaves no room for doubtfully questioning the appropriateness and propriety of all the charges found by the commissioner against Fischer and his sureties and credits allowed by him in them, with the exception of those to which we have referred as being unsustained by competent proof. Mrs. Ferrell not only showed by her testimony the cooperation of herself, her father and Fischer in an attempt to harmonize the blotter and cashbook entries severally made by them, but also the familiarity of Mr. Fischer with all

the items of charges and credits appearing upon these books due to his access to them, his frequent examination of them and conversations about them in her presence, upon some of which occasions Mr. Straus, one of the sureties, also was present, as he admits, though only for a few minutes and about a matter not affiliated with the transactions then under discussion.   That he knew the purpose in view and the relevancy of the examination being conducted by Fischer and Alexander and Mrs. Ferrell as to the financial affairs of the Homestead Building Association, then hopelessly insolvent, he does not deny but admits.   This proof is of such character as to leave no doubt of the competency of these books as evidence proper for consideration by the commissioner.

The respect in which the inspection of the books of the Second National Bank, the depository of the moneys collected by Fischer, prejudiced him, barring the items already excluded, is not apparent or pointed out satisfactorily.   For some purposes the books were not incompetent.   The parties interested had access to them.   Fischer was required to deposit in that bank the dues collected by him and to check against them to pay orders drawn on him for payment of the liabilities of the Homestead Building Association incurred in the conduct of the business for which it was chartered and organized.   The bank books had some comparative or relative probative value when examined in connection with the blotters and cashbooks.

Other assignments, although scrutinized upon this review to detect their real significance, are discussed either in this or the former opinion in such detail as not to require further reference to them.

To afford an opportunity to correct the errors pointed out, the decree pronounced December 19, 1916 is reversed, and the cause remanded, with direction to cause the amendments to be made, and for further proceedings therein.

*Reversed and remanded.*