Will of Stone: Estate of Stone, Appellant, vs. Central Republic Bank & Trust Company, Assignee, Respondent.

*April 14—May 9, 1933.*

For the appellant there was a brief by *Bottum, Hudnall, Lecher, McNamara & Michael,* and oral argument by *Louis A. Lecher* and *Suel O. Arnold,* all of Milwaukee.

For the respondent there were briefs by *Arthur J. Hughes, R. A. Bullinger,* and *Bender, Trump, McIntyre & Freeman,* all of Milwaukee, and oral argument by *Mr. Bullinger* and *Mr. Walter H. Bender.*

A brief was also filed by *Pellette & Zillmer* of Milwaukee, as *amicus curiæ.*

NELSON, J. The claim herein is based upon a written guaranty dated October 7, 1929, signed by Nat Stone and delivered to the National Bank of the Republic of Chicago, Illinois (hereafter called the "bank"), which guaranty was thereafter assigned to claimant, the Central Republic Bank & Trust Company. At all of the times to be mentioned, DeWolf & Company, Inc. (hereafter called the "company"), was engaged in the business of selling stocks and bonds, both as principal and as broker, and had its account at the bank. It was the practice of the company to deposit with the bank various stocks and bonds, principally the latter, on which loans were made. Transactions of that character were numerous, in fact of almost daily occurrence, and involved frequent changes of collateral. The company had no open or unsecured line of credit at the bank. Prior to September, 1929, the account of the company was large and in such a condition as to give the bank some concern. About September 1, 1929, the company applied to the bank for a special

"clearing loan" of $50,000. A "clearing loan" is one made to a bond dealer who brings to a bank an issue of bonds on which he desires a temporary loan while the bonds are being sold. The bonds involved in the "clearing loan" mentioned were issued by Inland States Service Company, and were originated by the company. When the application for the $50,000 loan was made the bank held a large amount of collateral to other loans made to the company. A considerable part of the collateral held by the bank was apparently unsatisfactory because of the fact that many of the bonds pledged originated with the company and had no satisfactory outside market. When application for that loan was made the bank apparently demanded security other than the proposed deposit of the Inland States Service Company bonds. Evidently Nat Stone was induced by the company to supply the additional security required. Just how he was induced to assist the company in the situation which confronted it does not appear. However, it appears that on September 3, 1929, Mr. Stone wrote the company, among other things, as follows:

"Upon the representation of your president, I have this day signed accommodation note for $50,000, collateralized by $65,000 worth of bonds, which I am assured are now selling on the market for $96 and up.

"This loan has been negotiated by your Mr. DeWolf with the National Bank of the Republic of Chicago, and is purely an act of accommodation on my part, DeWolf & Company as a corporation, John E. DeWolf, Sr., individual, and John E. DeWolf, Jr., individual, being guarantors and indorsers upon this transaction."

On the same date Mr. Stone wrote to the president of the bank in part as follows:

"I have this day signed a note for $50,000 payable at your bank, indorsed by John E. DeWolf & Company, John E. DeWolf, Sr., and John E. DeWolf, Jr., and collateralized

by $65,000 worth of bonds in a utilities corporation, which the DeWolf Company assures me it is now, and has been for a long time, selling on the public market at $96 and up. These bonds, I am advised, are in your possession as collateral security and the note matures within thirty days.

"I have accommodated Mr. DeWolf to this extent and appreciate your confidence in accepting my name for this extraordinary amount of money."

On September 4th Mr. Stone again wrote the bank in part as follows:

"I addressed a letter to your institution yesterday regarding a note which I signed for $50,000, indorsed also by DeWolf & Company, John E. DeWolf, Sr., and John E. DeWolf, Jr.

"I am advised that my use of the word 'accommodation' removes my liability and therefore does not cover the purpose which I intended it to represent. Please disregard the word 'accommodation' for I did not intend to remove myself or place any subterfuge in my communication that would relieve me of my responsibility in case of a default by DeWolf & Company.

"I fully recognize that this is a loan made to me, which I am turning over to them as a personal transaction, and you are holding securities of $65,000 in bonds, which the DeWolf Company advised me it is selling daily around $96.

"Will you please accept the note as I have it signed, holding the securities as collateral pending its maturity, it being a thirty-day collateral note signed as stated above.

"Thanking you for the confidence you are demonstrating, I am."

All three of the letters just mentioned were received in evidence over the objection of the claimant. The note mentioned in Mr. Stone's letters was evidently not acceptable to the bank. What further negotiations were thereafter had between the bank, Mr. Stone, and the company does not appear. It is, however, undisputed that on September 5, 1929, the company delivered to the bank its note for $50,000,

and on the same day Mr. Stone signed and delivered to the bank his written guaranty of the company's note. The note is as follows:

"491644 $50,000.

"Chicago, Ill., September 5, 1929.

"Thirty days after date, for value received, the undersigned (jointly and severally) promise to pay to the order of the National Bank of the Republic of Chicago fifty thousand and no-100 dollars at its banking house in Chicago, Illinois, with interest at the rate of seven per cent. per annum after maturity until paid. The undersigned hereby deposit . . . with and pledge . . . to said bank as collateral security for the payment of this note and of all other liabilities of the undersigned and of any and of each of the undersigned (if more than one) to said bank, or the legal holder of this note (whether direct or contingent, joint or several, heretofore or hereafter contracted, and howsoever and whensoever acquired by said bank or legal holder), the following property, the value of which is sixty-five thousand dollars ($65,000), viz: No. T-1 Temporary Inland States Service Company Convertible 6% Secured Gold Bond S for sixty-five thousand dollars ($65,000). . . .

"In case said bank or the legal holder of this note shall at any time hereafter be of the opinion that said property (including all substitutes therefor and additions thereto) is worth less than or has declined below the value above stated, or in case the undersigned or any or either of the undersigned (if more than one) shall fail to furnish additional security satisfactory to said bank or legal holder whenever called for, or shall fail to pay at maturity or any time thereafter this note or such other liabilities, or shall be or become insolvent, or shall die, or a judgment or decree be entered against the undersigned, or any or either of the undersigned (if more than one), then, and in each and every such case or contingency full power and authority is hereby given to said bank or legal holder to sell, assign, and deliver said property and all substitutes therefor and additions thereto, or any part thereof, at any time and from time to time, at any brokers' board or at public or private sale, at the option of said bank or legal holder, without advertising the same, or making protest, or demanding payment, or giving any notice of any kind to any one, and said bank or legal holder may be a pur-

chaser at said brokers' board, or public sale or sales; and after deducting from the proceeds of any such sale or sales, or from the proceeds of any other collection, protection or conversion of said collateral, all costs, expenses, and reasonable attorney's fees incurred in and about such sale or sales, or the protection or collection or conversion of said securities, or the collection of this note or such other liabilities, the residue of such proceeds shall be applied upon this note and such other liabilities, whether then due or not due, as and in the proportion said bank or the legal holder of this note may deem best, returning the surplus, if any, to the undersigned, or to any or either of the undersigned (if more than one). Neither said bank nor the holder hereof shall be liable for failure to collect or demand payment of, or protest or give notice of non-payment of said pledged property or any part thereof, or for any delay in so doing; nor shall said bank or the holder hereof be under obligation to take any action whatever in regard to said pledged property or any part thereof. Said bank or the legal holder of this note may at any time, either before or after the maturity of this note, appropriate and apply any and every indebtedness (including all moneys on deposit, credits, balances, moneys, collections, drafts, bills, notes, checks and property of every kind, tangible and intangible, whether in custody or in transit), due or owing from said bank or legal holder to or held for the undersigned, or any or either of the undersigned (if more than one) and/or to any indorser and/or guarantor upon this note and such other liabilities, without protest, or demand upon, or notice of any kind to any one, and may make such appropriation and application as and in such proportion as said bank or legal holder may deem best. It is expressly understood and hereby agreed that in the event the undersigned, or any of them, become insolvent before the first above mentioned time of maturity of this note, then that this note shall simultaneously with the happening of such insolvency become due and payable. Demand, protest, and notice of non-payment is hereby severally waived by the makers, indorsers, and guarantors.

"This instrument is an Illinois contract and shall be construed under and subject to the laws of the state of Illinois.

"DeWolf & Co., Inc.

"Address: ———.　　　　　By John E. DeWolf, Pres."

The guaranty signed by Mr. Stone on September 5, 1929, was in all respects similar to the guaranty signed by him on October 7, 1929 (to be hereafter recited).

At the time the company delivered its note dated September 5th to the bank it deposited with the bank the property mentioned and described therein.

On September 25, 1929, the company paid $5,000 to the bank, and on September 27, 1929, the further sum of $4,150. Both of such payments were indorsed on the note of September 5, 1929, leaving a balance unpaid thereon of $40,850. On October 7th thereafter the company delivered to the bank its note for $40,850 in renewal of the balance due on the note of September 5th, which had become due and payable. The space on the renewal note which was suitable for the listing of collateral was left blank. On October 7, 1929, Mr. Stone signed and delivered to the bank another written guaranty which was identical in form with the guaranty theretofore given except as to the date and amount of the note guaranteed.

The guaranty dated October 7, 1929, on which the claim herein is founded, is in words and figures as follows:

"In consideration of the National Bank of the Republic of Chicago, hereinafter called the 'bank,' making a loan of forty thousand eight hundred fifty dollars ($40,850) to DeWolf & Company, Inc., hereinafter called the 'debtor,' evidenced by a collateral promissory note for said amount, dated October 7, 1929, payable thirty (30) days after date, signed by said DeWolf & Company, Inc., and in further consideration of one dollar to me in hand paid by said bank, the receipt whereof is hereby acknowledged, I do hereby guarantee to said bank, its successors and assigns, the prompt payment at maturity of said debt and liability, and I agree to pay the same promptly at maturity without notice, demand or protest. I further agree, in case of dissolution, failure, insolvency, or bankruptcy of said debtor, to pay said debt and liability forthwith, without notice, demand or protest, and whether then due or not.

"Said 'bank' may, in its sole discretion, from time to time, without notice or demand, and upon such terms and conditions as it may deem proper or advisable, (1) sell (at public or private sale), pledge, surrender, compromise, release, renew, extend, alter, exchange, and/or otherwise deal with and/or dispose of any and all property, property rights, obligations, indorsements and guaranties now or hereafter held by said 'bank' as security for or in connection with said debt and liability and/or (2) make changes in, or renewals and extensions of, the time, mode and terms of payment of said debt and liability, or any part thereof.

"The various rights, powers, remedies and discretions herein conferred upon said 'bank' shall be deemed cumulative and no one or more of them as exclusive of the other rights, powers, remedies and discretions or of any rights, powers, remedies and discretions now or hereafter existing at law or in equity. No exercise, delay in exercising, or omission to exercise any of such rights, powers, remedies and discretions shall be held to waive or to exhaust any of such rights, powers, remedies and discretions, and every such right, power, remedy and discretion may be exercised repeatedly.

"My liability under this guaranty shall not be reduced or impaired by reason of said 'bank' failing to take any action with respect to, or failing to realize upon, any such property, property rights, obligations, indorsements or guaranties or to perform any duties, it may owe said 'debtor,' or by reason of any alteration of any contract, express or implied, or by any change in said 'debtor' by dissolution, failure, insolvency or bankruptcy. Said 'bank' shall never be bound to resort for payment to said 'debtor' or to any property, property rights, obligations, indorsements or guaranties now or hereafter held by said 'bank' as security, or otherwise. I hereby waive notice of the acceptance of this guaranty by said 'bank,' of any and all defaults by said 'debtor' or others, and of all things now existing or hereafter occurring in any dealings between said 'bank' and said 'debtor' or others. It is understood that this guaranty covers the foregoing obligation of 'debtor' plus interest thereon at the rate of seven per cent. (7 %) per annum from maturity until paid; but I agree to pay in addition to said sum all costs, expenses and attorney's fees which said 'bank' may pay or incur in and

about endeavoring to collect said debt and liability or to realize upon such property, property rights, obligations, indorsements or guaranties, or to enforce this guaranty.

"This guaranty is an Illinois contract and shall be construed under and subject to the laws of the state of Illinois.

"This guaranty and every part thereof shall be binding upon me and upon my heirs, legal representatives, successors and assigns, and shall inure to the benefit of said 'bank,' its successors and assigns.

"Witness my hand and seal this 7th day of October, A. D. 1929.                    (Signed)        NAT STONE.    (Seal)."

On September 30, 1929, prior to the giving of the renewal note and guaranty, dated October 7th, the company paid to the bank $3,200 and withdrew bonds of the Inland States Service Company of the par value of $4,000. The withdrawal order or receipt was signed by DeWolf & Company. The receipt contained the following language:

"If the above transactions do not refer to your account with this bank, please specify particulars.

"Loan with Nat Stone.

"For account of ———."

The $3,200 paid to the bank was credited on notes of the company other than the note dated September 5, 1929, guaranteed by Mr. Stone.

On October 29th thereafter, the bank accepted from the company a junior mortgage executed by Willard Ground Rent Company of Milwaukee, for $100,000, dated October 26, 1929, due October 26, 1930, and the bank, pursuant to written instructions of the company bearing date October 28, 1929, surrendered to Willard Ground Rent Company various bonds of the par value of $110,000, among which were the remaining Inland States Service Company bonds originally deposited with the bank on or about September 5, 1929, and described in the company's note of that date. On October 29, 1929, the date of the acceptance of

the junior mortgage mentioned, the bank credited the sum of $100,000 on notes then owing to the company other than the note guaranteed by Mr. Stone.

The foregoing facts are not in dispute and are substantially as found by the court. The court concluded that the estate was indebted to the bank in the amount claimed, together with interest from the date of the maturity of the note dated October 7, 1929. The matter of the amount of the costs and expenses to which the claimant might be entitled was by stipulation left for future determination, to be inserted at the foot of the judgment after the liability of the estate had been determined by the court or after appeal to this court.

The estate contends that the court erred (1) in finding that the guaranty constituted a valid and subsisting contract between the bank and Nat Stone, (2) in finding that the guaranty was not void for fraud, and (3) in finding that the note of DeWolf & Company guaranteed by Stone had not been paid.

The questions therefore which require determination are (1) whether the guaranty constituted a valid contract, (2) whether the guaranty was void for fraud, and (3) whether the bank received payment of the loan guaranteed.

(1) The executors first contend that the guaranty of October 7, 1929, never became a valid and binding agreement because the conditions precedent upon which liability depended never came into being. It is argued that that guaranty guaranteed only the prompt payment at maturity of a loan "evidenced by a collateral promissory note;" that after October 7, 1929, the loan was not evidenced by such a note since the blank space on the note in which the collateral might have been listed was not filled in. With these contentions we cannot agree. It is conceded by the executors that the note of September 5th was a collateral note be-

cause the collateral pledged was described therein. It is also conceded that on October 7th the bank still held, as collateral security, Inland States Service Company bonds of the par value of $60,400. It clearly appears that the note of October 7th was given by the company in partial renewal of the note of September 5th, and that the note of October 7th was understood by Mr. Stone to be a partial renewal of the former note. The courts seem not to have specifically defined the term "collateral promissory note," but we think that a note may properly be said to be a collateral note even though it is not so denominated and does not contain specific agreements as to the property pledged, if property is in fact delivered and pledged to secure it. A simple note secured by collateral is just as much a collateral note as though the collateral pledged were described on the face of a note containing specific agreements as to the property pledged.

There can be no doubt as to the identity of the note guaranteed by Mr. Stone. The executors do not claim that if the Inland States Service Company bonds had been described in the note of October 7th, such note would not be fully identified.

Since it appears that the note of October 7th was given in renewal of the note of September 5th, and that certain collateral pledged and delivered to the bank with the note of September 5th remained in the possession of the bank, such collateral continued as security for the renewal note even though no reference or specific mention of the collateral was contained in such note since there was no specific agreement to the contrary. It is well established that where collateral is pledged to secure an original note, the giving and acceptance of a renewal note does not release the collateral or free it as security, but such collateral continues as security for the payment of the renewal note without express agreement, unless there is an agreement to the contrary. In Colebrooke

on Collateral Securities (2d ed.), sec. 14, the rule is stated as follows:

"The renewal of a negotiable bill or note representing the principal indebtedness, for the payment of which collateral securities have been deposited, does not affect the right of the creditor to retain or enforce the collaterals. He is equally entitled to the benefit of the collateral security as a means of obtaining payment of the note or bill given in renewal as in the case of the original evidence of indebtedness."

In Jones on Collateral Securities (3d ed.), sec. 541, the rule is stated thus:

"A renewal of a note secured by a pledge merely extending the time of payment does not extinguish the debt, and is not a payment of it which will discharge the creditor's claim upon the collateral security. Upon payment of a part of the original note, and the execution of a new note in renewal of the remainder of the debt not paid, a pledge taken as security for the original note will stand as security for such new note, in the absence of any agreement to the contrary."

See, also, *Cobb v. Vaughan & Co.* 141 Va. 100, 126 S. E. 77, 43 A. L. R. 177; *Citizens' Bank & Trust Co. v. Thornton,* 174 Fed. 752; *Morehead v. Citizens' Deposit Bank,* 130 Ky. 414, 113 S. W. 501; *Dayton Nat. Bank v. Merchants' Nat. Bank,* 37 Ohio St. 208.

In *Holland Trust Co. v. Waddell,* 75 Hun, 104, 26 N. Y. Supp. 980 (affirmed, 151 N. Y. 666, 46 N. E. 1148), it was said:

"The principle is too well settled to need citation of authorities, that the renewing of notes from time to time in no way extinguishes the original debt; it is simply an extension of the time of payment and a change as to the evidence of the debt, and all collaterals pledged for the payment would remain as security notwithstanding the extension of the time of payment."

We conclude, under the facts and circumstances of this case, that the note of October 7th must be held to be a collateral promissory note, even though the collateral was not described therein.

(2) The executors further contend that since Mr. Stone was not informed at the time he signed the guaranty of October 7th that the bank had theretofore surrendered to the company bonds of the par value of $4,000 in consideration of the payment to it of the sum of $3,200 which had been applied on indebtedness of the company other than the note dated September 5th guaranteed by Stone, the bank acted fraudulently and such fraud vitiated the guaranty of October 7th. Although such contention was apparently made below, the court made no finding in respect to this issue. The executors, however, contend that it appears, as a matter of law, from the undisputed evidence, that the bank acted fraudulently in not informing Mr. Stone that some of the bonds had been surrendered to the company and that the remaining collateral was not actually listed on the face of the note of October 7th. We see nothing in the facts relied on which tends to show any fraud on the part of the bank. From the evidence it appears that Mr. Stone never saw either of the notes guaranteed by him. When the guaranty of October 7th was presented to him for signing he stated that he understood its provisions and signed it without question or comment. When the company withdrew some of the bonds and paid to the bank $3,200, the bank did not violate any agreement with either the company or with Mr. Stone. Since it appears that Mr. Stone was an experienced business man and that no representations were made to him, it must be held that he became bound by the terms of his guaranty and that his estate occupies a no more favorable position.

(3) The executors further contend that under the undisputed facts it should be held that the note of October 7th

was fully paid. This contention is based on the facts that on October 29th the bank accepted from Willard Ground Rent Company a junior mortgage for $100,000 and, at the same time, credited the company on its notes other than the note guaranteed by Mr. Stone with the $100,000, and, pursuant to instructions from the company, surrendered to Willard Ground Rent Company bonds of the par value of $110,000, which included the remainder of the Inland States Service Company bonds held by the bank. The weakness of this contention is found in the fact that no instruction was given or request made by the company as to the application of such payment. In the absence of a request by the company directing the application of the payment the bank had the authority to apply it as it saw fit. The law is well settled in Illinois and elsewhere that in case of a voluntary payment made by a debtor without instructions the creditor may apply the payment as he chooses. If the payment is not applied by either the debtor or creditor the court will apply it, being governed by equitable principles. *Koch v. Roth,* 150 Ill. 212, 37 N. E. 317; *Drake v. Sherman,* 179 Ill. 362, 53 N. E. 628; *Monson v. Meyer,* 190 Ill. 105, 60 N. E. 63; *Illinois Refining Co. v. Welch,* 341 Ill. 292, 173 N. E. 345.

Where a debtor, at the time he makes a payment, owes several notes to the creditor, one of which is guaranteed by a third person, and there is no request to apply the payment to the guaranteed note, there is no obligation on the part of the creditor so to do and the guarantor or surety may not complain because the undirected payment was applied on notes other than the one guaranteed by him. In 28 Corp. Jur. p. 1005, the rule is stated thus:

"In accordance with the rules relating to the application of payments in general, where a creditor has several debts against another, or one debt consisting of different items, part of which is guaranteed, the guarantor, as a general rule,

cannot control a payment made by the debtor or a fund in the creditor's hands belonging to the debtor, and require that it be applied to the part covered by his guaranty, especially where an agreement between the debtor and creditor provides for a different application. But the debtor in making payment may apply it to either debt, or part thereof, he chooses, provided this application is made at the time of the payment; or if the payment is made generally without any designation as to where it is to be applied, the creditor may, as he elects, apply it to either a guaranteed or an unguaranteed debt, except that he cannot apply such payment to a debt which is not due to the exclusion of a guaranteed debt which is due. . . ."

See, also, 12 Ruling Case Law, p. 1082, and the note in 21 A. L. R. 696 to *Wait v. Homestead Building Asso.* 81 W. Va. 702, 95 S. E. 203, where the author of the note says (p. 704):

"It is well settled that a . . . guarantor cannot, in the absence of an agreement or of special equity in his favor, direct or control the application by the principal and the creditor, or either of them, of payments made by the principal from his own funds; . . . the mere fact that one of the debts in question is covered by the obligation of a guarantor . . . does not defeat the right of the principal debtor in the first instance, or, in case of his failure, the right of the creditor, to apply the payment to another debt due from the principal."

See notes found in 49 A. L. R. 952 and 60 A. L. R. 204. See, also, *Hansen v. Rounsavell,* 74 Ill. 238, where it is said:

"But it is claimed that if there was no agreement for the appropriation, then the circumstance of there being sureties for one debt should control the application in protection of the sureties to that debt. But we understand the general rule to be otherwise, and that it is the creditor's right in such case to have the payment applied to the debt which is the most precarious, where there is nothing to control this application. 2 Parsons, Contracts, 631, 632."

We think the contention of the executors that the note guaranteed by Mr. Stone was paid is without merit.

In the final analysis of this controversy the liability of the estate rests upon the terms of the guaranty signed by Mr. Stone. The guaranty conferred upon the bank almost absolute discretion to act with respect to the collateral held by it. While it now appears that the signing of the guaranty was a most unwise act on the part of Mr. Stone in view of the financial crash which occurred during the same month, he nevertheless bound himself and his estate as therein provided. By signing the guaranty he guaranteed "the prompt payment at maturity of said debt and liability," and further agreed that "said bank may, in its sole discretion from time to time, without notice or demand, and upon such terms and conditions as it may deem proper or advisable, (1) . . . surrender, . . . release, . . . exchange, . . . and / or otherwise deal with and / or dispose of any and all property, property rights, obligations . . . now or hereafter held by said bank as security for or in connection with said debt and liability. . . ." He further agreed "that said bank shall never be bound to resort for payment to said debtor or to any property, property rights, obligations . . . now or hereafter held by said bank as security or otherwise. I hereby waive notice of the acceptance of this guaranty by said bank, of any and all defaults by said debtor or others, and of all things now existing or hereafter occurring in any dealings between said bank and said debtor or others." These provisions of the guaranty may not be ignored. Giving to them their plain, ordinary meaning we are compelled to hold that they authorized the bank, in its discretion, to release or surrender to the debtor or, as directed by it, the collateral held by the bank, without affecting the liability of Mr. Stone under the guaranty. What Mr. Stone's connection with the company was does not appear. It seems clear, however, that he had full faith in its ability to meet its obligations. He voluntarily signed the guaranty and became bound thereby. It is beyond the power of this court, with-

out doing violence to the law of contracts, to relieve his estate of liability.

*By the Court.*—Order affirmed.

FOWLER, J. (*concurring*). I concur in the decision of the case on the ground that, the defenses of fraud and payment not being sustained, the guaranty signed by Mr. Stone shows on its face that he had no right to require that the collateral referred to in the note guaranteed be devoted to its payment, or be turned over to him to apply to reimburse him for payments he might make. It expressly provides that the bank might release or surrender the collateral. If the bank might do either, manifestly the collateral was no security or protection to Mr. Stone. I cannot agree, as the opinion may be taken to imply, that the note in suit was a collateral note such as a guarantor has the right to assume a note is that he guarantees without seeing, which is described in the guaranty as a collateral note with specified collateral. One so signing would naturally understand and might rightly assume that the collateral specified in the note was put up as security for the payment of that particular note and might be applied to his reimbursement in case he himself made payment. The collateral specified in the note in suit was not security for the particular note, but was security for every and could be devoted to any item of indebtedness of the company to the bank. Mr. Stone, in case he did not see the note, and there is no evidence that he did see it, would have had the right to assume, had the terms of the guaranty not informed him to the contrary, that he could protect himself, in case he was required to pay the note, by applying the collateral to his reimbursement. But as the terms of his guaranty negative this idea, his estate is clearly liable for judgment for the amount of the note, as his guaranty is one of payment.