**MILLER BREWING COMPANY,**
**Plaintiff-Appellee,**

v.

**Joseph GREGG, Defendant-Appellant.**

**No. 17422.**

United States Court of Appeals
Sixth Circuit.

Jan. 12, 1968.

Frank K. Levin, Cleveland, Ohio, for appellants.

Creighton E. Miller, Cleveland, Ohio, for appellee.

Before O'SULLIVAN, CELEBREZZE and COMBS, Circuit Judges.

COMBS, Circuit Judge.

This is an appeal from a judgment based on a jury verdict awarding plaintiff, Miller Brewing Company, $27,626.75 against the defendant, Joseph Gregg, on a guaranty agreement.

In April, 1961, Surf Beverage Corporation entered into a distributorship agreement with Miller Brewing Company under which Surf was to distribute Miller beer in San Diego, California. Gregg, a resident of Ohio, was a major stockholder and president of Surf. The agreement provided for wholesales of beer by Miller to Surf, with specific provisions in regard to transportation and payment. The agreement stated "these sales to us [Surf] are made on a shipment to shipment basis only. Either of us may terminate this relationship at any time without incurring liability to the other." Provision was made for the repurchase of unsold beer by Miller and for the disposition of equipment in the event of termination.

In October, 1961, Surf submitted and Miller "accepted" an "Application for Credit", which set up a typical warehousing arrangement for financing transactions between the parties. Under this agreement and the original distributorship agreement Miller would send a shipment of beer by carrier and at the same time transmit the invoice to Surf. The beer would be deposited in a "SECURED SECTION" of a warehouse, and Surf would make such daily removals from the section as were necessary in its business. Under the terms of the agreements Surf was required to send to Miller twice each week payment for removals along with the "car number" (invoice number) of the beer removed.

Surf became in arrears on its payments and some of its checks tendered to Miller were returned by reason of insufficient funds. The amount of the account deficit was approximately $44,000.00. Floyd Parfrey, assistant treasurer and supervisor of credit for Miller, informed Gregg that Miller wanted him to sign a personal guaranty for Surf's account before Miller shipped additional beer. Parfrey mailed Gregg a printed guaranty agreement form and asked him to return a personal financial statement with the signed form. Gregg signed the guaranty with "Joseph Gregg" on one line and on the line below "Pres", with a squiggle on each side. One of the squiggles or curlicues appeared to be the common short notation for the word "and". The financial statement showed Gregg's personal assets to be in excess of $1,000,000.00. The guaranty was dated March 16, 1962, and contained this statement: "This guaranty shall become effective as to all sales and shipments made to such corporation [Surf] on and after the date hereof. * * * *"

The guaranty provided that it was to be construed according to the laws of Wisconsin where Miller's principal office was located.

In addition to the agreement spelled out in the guaranty contract, the parties apparently agreed orally on a method of payment of the balance due at the time the guaranty contract was executed. A letter from Parfrey to Surf dated March 19, 1962, refers to such an agreement. It reads in part:

It was agreed with Mr. Joseph Gregg that because of the shortage of operat-

ing cash in your business, payment for the outstanding balance would be on the basis of $1,000 a week plus all charges for current removals. All future payments would be in strict accordance with our warehousing agreement, and that he would personally guarantee the account of the corporation.

\* \* \* \* \* \*

"The following is a list of our invoices that have been included under the extended credit warehousing program:

[Invoice numbers of shipments made prior to the date of the guaranty.]"

Copy of this letter was sent to Gregg and, so far as is shown by the record, he did not reply. Parfrey testified that as the arrangement worked in practice Surf paid an additional $1,000.00 each time it made a withdrawal from the secured section of the warehouse. Miller allowed Surf a discount on each withdrawal payment after the date of the guaranty. A few of Surf's $1,000.00 payments were made by checks returned to Miller because of insufficient funds but there was evidence that these checks were covered later by a bank draft.

Miller terminated the distributorship for unexplained reasons on August 28, 1962, and filed this suit against Gregg on the guaranty contract. It was alleged in the complaint that Surf owed Miller $27,626.75 and that Gregg was personally liable for that amount. Gregg answered that there was no personal guaranty; that no debt was incurred during the period of the guaranty; and that Miller's accounting failed to include all credits to Surf. Gregg also filed a cross-complaint against Miller for damages resulting from the termination of the distributorship. Surf filed an intervening complaint on substantially the same grounds. During the course of the trial, the district judge ordered both of these pleadings stricken. We agree that these pleadings were properly stricken, both on procedural and substantive grounds.

The only witness for Miller was Parfrey. He testified from a summary of the records of the Surf account which he had prepared for use at the trial of this case. When Surf asked for the original records, the court interposed: "Well, they are in Milwaukee, sir, so you can't get them." Reference will be made to this ruling of the court later in this opinion. Parfrey testified that Miller's bookkeeping was done by computer and that the computer was programmed to apply each payment as received from Surf to the account's oldest outstanding balance. Under this system of bookkeeping, called "first-in-first-out", the account balance which existed prior to the signing of the guaranty was satisfied on May 15, 1962, and only after that time did the computer begin to apply payments to shipments made after the date of the guaranty.

At the close of the evidence Gregg offered interrogatories and instructions which the court declined to give. The interrogatories, in essence, requested the jury to find whether Surf had paid Miller for all sales and shipments made after the time of the signing of the guaranty. At least one of the tendered instructions was directed toward the same point.

In a lengthy charge to the jury, the judge instructed that there were two issues in the case: whether Gregg was personally liable on his guaranty and, if so, how much he owed Miller as the result. The only comments by the judge regarding the amount of the recovery were that the "testimony of Parfrey at the conclusion that it [the debt] was $27,626.75 which they still owed when there was a termination here. I haven't seen any CPA come in to question Parfrey's claim, have you?" The remainder of the charge pertained to the issue of Gregg's personal liability on the guaranty agreement. Although this was one of the issues submitted to the jury, for all practical purposes the judge directed a verdict on this issue. He instructed the jury that "as a matter of law, it was his guaranty" and that "if Joseph signed this and added the word 'and Pres' or President \* \* \* he is personally

liable, and I charge you he is personally liable." The jury returned a verdict for Miller in the amount of $27,626.75.

 Even though the court's instructions amounted to a directed verdict on the issue of Gregg's personal liability on the guaranty agreement, we find no prejudicial error on this point because it is clear to us that Gregg did sign a personal guaranty and that the squiggles or curlicues added after his signature have no legal significance. The judge very properly could have made this ruling as a matter of law without submitting the question to the jury.

 The guaranty agreement is short and free from ambiguity. It therefore must be construed according to its terms. It contains these words: "This guaranty shall become effective as to all sales and shipments made to such corporation [Surf] on and after the date hereof * * *." The date was March 16, 1962. The jury should have been instructed, therefore, that Gregg was guarantor only as to payments for sales and shipments made after that date.

Miller contends that the "first-in-first-out" method of bookkeeping is a legally accepted method and that it had the legal right to apply the payments made by Surf after March 16 against the old account; that Surf has been given credit for all payments made by it and the outstanding balance of $27,626.75, which is the amount of the verdict, in legal effect represents the balance due for beer received by Surf after March 16, 1962.

It is clear that the total amount of money paid by Surf after March 16, the date of the guaranty agreement, was more than would have been required to pay for the beer which was withdrawn after that date.

The decisive question is whether Miller had the right to apply payments made by Surf after March 16, 1962, to the old account or whether those payments should have been applied first to current withdrawals of beer with the excess applied toward reduction of the old account.

 Gregg did not by the terms of the guaranty agreement guarantee payment of the old account but only "all sales and shipments made to such corporation [Surf] on and after the date hereof." Gregg had the burden, however, of showing either by express agreement or by the attending circumstances that the parties intended that payments made after the date of the guaranty would be applied first against current withdrawals. In the absence of such a showing by Gregg, Miller had the right to apply the payments against the old account. The general rule is stated in 57 A.L.R.2d 855, 859 (1958):

"In the event it becomes the duty of a court to make application of a voluntary payment the intention of the parties as determined from all the circumstances will be followed irrespective of the rights of a surety or guarantor, but if no intention can be inferred or implied, generally in jurisdictions in which the common law is followed the interests of the creditor are preferred, and the payment will be applied to a debt other than that for which the surety is liable."

Also see 38 C.J.S. Guaranty § 78, Guaranty, Application of Payments, p. 1248. The Wisconsin courts, to which, by the terms of the guaranty agreement, we look for guidance in construction, follow the general rule. In re Stone's Will, 211 Wis. 518, 248 N.W. 446 (1933); Sorge Ice Cream and Dairy Co. v. Wahlgren, 28 Wis.2d 220, 137 N.W.2d 118 (1965).

 The question of what the parties intended as to application of payments made by Surf, that is whether they were to be applied on the old account or against current withdrawals, was properly a question for the jury and that issue should have been submitted under proper instructions. For the purpose of showing the intention of the parties Gregg had the right, of course, to insist on the production of the original records of the account. Since timely objection was taken by Gregg to the court's failure to instruct on the question of the parties intention with regard to

application of payments, the judgment must be reversed and the case remanded for a new trial.

It thus becomes unnecessary to decide whether the court's instructions are prejudicially erroneous as being too argumentative. Attention is called to the opinion of this Court in United States v. Porter, 386 F.2d 270, decided December 7, 1967.

Reversed and remanded for proceedings consistent with this opinion.